GLOBAL NAPs, INC. *vs.* VERIZON NEW ENGLAND, INC.[1]

No. 04-P-247.

Suffolk. December 7, 2004. - May 23, 2005.

Present: GREENBERG, LAURENCE, & COHEN, JJ.

*"Anti-SLAPP" Statute. Constitutional Law,* Right to petition government. *Statute,* Construction.

In an action brought against a telecommunications provider (defendant), alleging defamation and trade disparagement arising from a statement made by the defendant's employee to a newspaper reporter, the judge properly denied the defendant's special motion to dismiss, brought pursuant to G. L. c. 231, § 59H, the "anti-SLAPP" statute, where the defendant failed to demonstrate that the statement in question, which was a tangential statement intended, at most, to influence public opinion in a general way unrelated to governmental involvement, was made "in connection with" a matter under review by the Department of Telecommunications and Energy and thus constituted protected petitioning activity as defined by the statute. [603-607]

CIVIL ACTION commenced in the Superior Court Department on January 28, 2003.

A special motion to dismiss was heard by *Margaret R. Hinkle,* J.

*Joseph D. Steinfield (David E. Plotkin* with him) for the defendant.

*Jeffrey C. Melick* for the plaintiff.

GREENBERG, J. At the center of this action is a clash between telecommunications providers, both of which are regulated by the Federal Communications Commission under the Telecommunications Act of 1996, 47 U.S.C. §§ 251 et seq. (2000). Pursuant to 47 U.S.C. § 252(b)(1), the plaintiff, Global NAPs, Inc. (Global), brought two arbitration actions against the defendant, Verizon New England (Verizon), which were resolved

---

[1]Doing business as Verizon Massachusetts.

in Verizon's favor in 2002. Subsequent to those decisions, one of which had already been appealed, Jack Conroy, Verizon's regulatory affairs chief, gave an interview to a Boston Globe business reporter, who quoted Conroy as having said that the arbitrator's decision essentially shut down a "scam" that Global very cleverly had developed in the late 1990's.

As a result, Global brought the instant action against Verizon for defamation and trade disparagement. Verizon's special motion to dismiss pursuant to G. L. c. 231, § 59H (the anti-SLAPP[2] statute), was denied by a Superior Court judge, and Verizon appeals.[3]

1. *Background.* At issue is whether G. L. c. 231, § 59H, protects Verizon from liability for the disparaging statement Conroy made during the course of his interview with the Boston Globe reporter. In particular, Verizon contends that Conroy's comment satisfies the statutory definition of petitioning activity. It contends that Conroy's statement was made in connection with Global's pending appeal of the arbitrator's decision. We conclude that the statement does not fall within the ambit of the statute's protection because it was merely an oblique reference to Verizon's petitioning activity and was not a protected instance of "full participation . . . and robust discussion of issues before [a governmental body]." *Duracraft Corp.* v. *Holmes Prod. Corp.* 427 Mass. 156, 161 (1998), quoting from the preamble to 1994 House Doc. No. 1520.

To place the issue in context, we summarize the undisputed facts from the pleadings and affidavits contained in the record that both parties compiled for this appeal. The statement upon which Global bases its defamation claim was made within the context of a larger business dispute. Global and Verizon provide telecommunications services in Massachusetts. The two companies are competitors regulated by the Telecommunications Act of 1996 (1996 Act). Verizon, among other things, is

---

[2]The acronym "SLAPP" stands for Strategic Lawsuit Against Public Participation.

[3]Interlocutory review is appropriate in this case because the claims against the defendant would be entirely eliminated had the Superior Court judge granted its special motion to dismiss. See *Fabre* v. *Walton,* 436 Mass. 517, 522 (2002); *Baker* v. *Hobson,* 62 Mass. App. Ct. 659, 662-663 (2004).

an "incumbent local exchange carrier" (ILEC), which means that it provided telephone exchange service in Massachusetts prior to the passage of the 1996 Act. Global is a "competitive local exchange carrier" (CLEC), meaning that it began providing service after the 1996 Act required ILECs to allow CLECs to connect to their telecommunications networks and to enter into "interconnection agreements" that specify the terms of use and payments for service between companies. Global's business is routing "dial up" telephone calls from end users' computers to Internet service providers (ISPs). As competitors in a regulated industry, the two companies are frequently, if not constantly, involved in proceedings before courts and other governmental entities.

One feature of the 1996 Act is a provision for binding arbitration by State commissions when ILECs and CLECs cannot agree on the terms of an interconnection agreement. In Massachusetts, such arbitration is before the Department of Telecommunications and Energy (DTE). 47 U.S.C. § 252(b)(1). The two arbitration actions against Verizon were decided by the DTE in Verizon's favor on December 12, 2002, and December 20, 2002. Both arbitrations were related to Global's provision of virtual exchanges to ISPs. A virtual exchange allows dial-up Internet users to dial what appears to be a local telephone number to connect to ISPs whose physical equipment is at Global's Quincy premises, regardless of whether the dial-up customer ordinarily can make "local" calls to Quincy. Global and Verizon disagreed whether such calls should be treated as "local" in their interconnection agreement. If deemed "local" under the 1996 Act, Verizon would be responsible for toll-free transmission of its customers' "local" calls all the way to Quincy, and Verizon would also have to pay Global for each call by one of its customers to Global's virtual "local" exchange. If the calls were not treated as "local," Global would pay the cost of transmission to Quincy and would not be entitled to payment for receiving calls from Verizon customers. In the first ruling, the DTE determined that the companies should not treat Global's use of "virtual exchanges" as "local" calls. In

the second ruling, the DTE determined that the interconnection agreement between the companies did not require reciprocal payments to Global for ISP-bound calls from Verizon customers. Global appealed the December 12, 2002, ruling before the comments that gave rise to its defamation claim were made.

On January 3, 2003, the Boston Globe printed an article about the arbitration rulings. Howe, Firms Come Up Empty vs. Verizon in Rulings, Boston Globe, January 3, 2003, at E3. The article stated that "[i]n a pair of rulings" the DTE determined that "[Internet] traffic originated by Verizon customers does not consist of local calls that require Verizon to make so-called reciprocal compensation payments to carriers such as . . . Quincy-based Global NAPs." *Ibid.* It said that the rulings "closed what Verizon called 'a loophole' forcing it to pick up the cost of carrying [Internet] traffic from throughout Eastern Massachusetts to Global NAPs' data center in Quincy." *Ibid.*

The article then summarized and quoted a conversation between the reporter and Conroy, which became the focus of Global's defamation claim:

> "Jack Conroy, Verizon's Massachusetts regulatory affairs chief, said the DTE ruling shut down 'a scam' he said Global NAPs very cleverly developed in the late 1990s. Using so-called virtual phone numbers throughout the state that did not require Global to install any switching equipment, Conroy said, Global got Verizon to pay for most of the cost of handling calls to its Internet service provider customers while claiming Verizon owed it additional reciprocal compensation payments as well."

*Ibid.*

2. *Analysis.* The burden is on Verizon as the moving party to make a threshold showing that the activity at issue is petitioning activity within the purview of the anti-SLAPP statute. *Fabre* v. *Walton*, 436 Mass. 517, 522 (2002). In support of its motion, Verizon furnished affidavits and pleadings to the motion judge indicating that Conroy's comment was made "in connection with a matter under review by the DTE and the courts" and,

thus, "constituted . . . petitioning activity" as defined by the anti-SLAPP statute. The judge rejected this contention.[4]

Relying on a broad reading of the statutory definition of a "party's exercise of its right to petition," Verizon argues that the motion judge's determination was incorrect. The statute states that "a party's exercise of its right of petition" shall mean:

> "[1] any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; [2] any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; [3] any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; [4] any statement reasonably likely to enlist public participation in an effort to effect such consideration; or [5] any other statement falling within constitutional protection of the right to petition government."

G. L. c. 231, § 59H, sixth par., inserted by St. 1994, c. 283, § 1. Verizon focuses on the second phrase in the definition, arguing that Conroy's statement was made "in connection with" the appealed DTE ruling and was therefore protected by the statute. Under this view, any statement about an issue under some form of government consideration, whether defamatory or not, would be protected by the statute. We read the phrase "in connection with" more narrowly.

The statute enumerates no fewer than five types of statements

---

[4]Although we agree with the judge's conclusion that Conroy's comments did not constitute "petitioning activity" as contemplated by the statute, we reach our conclusion for different reasons. The judge based her decision, in part, on the view that "[t]he only party that exercised the right of petition to seek protection of its rights in this matter was [Global]," as it was the party that initiated arbitration proceedings and appealed the results of arbitration. We question this portion of the Superior Court's decision limiting the protection of the anti-SLAPP statute to those parties who first bring a dispute to the attention of governmental officials or seek to have some adjudicatory body resolve a claim. See *Kobrin* v. *Gastfriend,* 443 Mass. 327, 338 (2005) ("there is no statutory requirement that petitioning parties directly commence or initiate proceedings"). See also *Wynne* v. *Creigle, ante* 246, 253 n.9 (2005).

that comprise petitioning. Verizon focuses exclusively on the second category and asks us to read it broadly and in isolation. Paying attention to the context compels the conclusion that the sweep of "in connection with" is limited because the phrase pertains to statements made to influence, inform, or at the very least, reach governmental bodies — either directly or indirectly. Specifically, the first, third, and fourth phrases support reading "in connection with" as embodying, to some extent, similar purposive elements.[5] Additionally, Verizon fails to acknowledge that the first sentence of G. L. c. 231, § 59H, refers to a "party's exercise of its right of petition under the constitution of the United States or of the Commonwealth." See *Plante* v. *Wylie*, *ante* 151, 156 n.6 (2005). That a statement concerns a topic that has attracted governmental attention, in itself, does not give that statement the character contemplated by the statute.

Our conclusion in this case is supported by three recent decisions, *Kobrin* v. *Gastfriend*, 443 Mass. 327 (2005)[6]; *Plante* v. *Wylie*, *supra*,[7] and *Wynne* v. *Creigle*, *ante* 246 (2005). All three of these decisions emphasize the language set forth in the first sentence of G. L. c. 231, § 59H, i.e., that claims sought to be dismissed pursuant to a special motion must be "based on said party's exercise of its right to petition under the constitution of

[5]The last, or fifth, phrase in the list, "any other statement falling within constitutional protection of the right to petition government," is different in nature from the first four. The list nonetheless suggests a more limited reading than Verizon advocates. This final phrase serves as a catchall provision at the end of the enumeration, and we read it to indicate that the four specific items listed in the sixth paragraph of c. 231, § 59H, are meant to be illustrative, not exhaustive. Such a catchall provision does not change or expand the nature of the other listed statements or activities.

[6]In *Kobrin* v. *Gastfriend*, *supra*, the Supreme Judicial Court determined that the statute did not protect a defendant whose relationship to the petitioning activity under analysis was in the capacity of a paid expert. Specifically, the Supreme Judicial Court stated, "In other words, the statute is designed to protect overtures to the government by parties petitioning in their status as citizens. It is not intended to apply to those performing services for the government as contractors." *Id.* at 332.

[7]In *Plante* v. *Wylie*, *supra*, this court reversed the denial of a special motion to dismiss filed by the defendant, an attorney who was representing a party unarguably involved in petitioning activity. This court held that such legal representation was on a "very different footing" from that of the paid expert. *Plante* v. *Wylie*, *supra* at 156. Essentially, the court held that the attorney's status was coextensive with that of his clients.

the United States or of the Commonwealth." As the Supreme Judicial Court stated in *Kobrin* v. *Gastfriend, supra* at 333, "The right of petition contemplated by the Legislature is thus one in which a party seeks some redress from the government." In the instant case, the tangential comment is not one that is related to the petitioning process.

The recent case bearing most directly on the issues here is *Wynne* v. *Creigle, supra.* In *Wynne*, a former firefighter brought suit against the widow of a deceased firefighter on the basis that she had defamed the plaintiff in the course of a fire department investigation. The plaintiff alleged that both a written statement to the Greenfield fire department and articles in the Greenfield newspaper contained defamatory statements by the defendant about the plaintiff. Sometime after her husband's death, which was a suicide and which the defendant maintained was precipitated by the plaintiff's harassment of her husband, the defendant pursued legislative benefits as the widow of a deceased firefighter. See *Wynne* v. *Creigle, supra* at 248 & n.3. At oral argument the plaintiff apparently conceded that the written statement to the Greenfield fire department made during the course of an investigation came within the ambit of the anti-SLAPP statute. *Wynne* v. *Creigle, supra* at 253. Therefore, this court only had for its consideration the question whether the statements to the newspaper reporter were entitled to anti-SLAPP protection.

The court reasoned that the statements to the Greenfield newspaper "were essentially mirror images of those she made during and 'in connection with' the departmental investigation of the plaintiff. Taken in context, her mere repetition of those statements to the media was also possessed of the characteristics of petitioning activity." *Wynne* v. *Creigle, supra* at 254. Additionally, the court concluded that "the defendant's statements were sufficiently tied to and in advancement of her petition for benefits as the widow of a firefighter . . . [to] fall within the ambit of statements made 'in connection with' legislative proceedings within the meaning of G. L. c. 231, § 59H, and constitute protected petitioning activity on that basis as well." *Ibid.*

An examination of the materials supporting Verizon's motion does not indicate that Conroy's disparaging comment concern-

ing Global's position before the DTE had the potential or intent to redress a grievance, or directly or indirectly to influence, inform, or bring about governmental consideration of the issue. Because it lacks that crucial characteristic, the case law suggests it should not be deemed petitioning protected by the statute. Unlike the statements to the reporter that were found to be protected in *Wynne,* the statements here were not "mirror images" of what was said in a governmental forum, nor were they made in conjunction with any legislative petitioning. *Wynne* v. *Creigle, supra* at 254. Instead, the comments were incidental observations that were not tied to the petitioning activity in a direct way. See *McLarnon* v. *Jokisch,* 431 Mass. 343, 348 n.7 (2000) (special motion to dismiss should not be allowed "merely because there is ongoing litigation between the parties in a different forum"); *Ayasli* v. *Armstrong,* 56 Mass. App. Ct. 740, 749 (2002). Contrast *Office One, Inc.* v. *Lopez,* 437 Mass. 113, 122-123 (2002) (communications with officials from the Federal Deposit Insurance Corporation and efforts to spur others to contact elected officials, by unit owners of a condominium opposing plaintiff's purchase of units, fall within the definition of petitioning activity protected by the statute); *MacDonald* v. *Paton,* 57 Mass. App. Ct. 290, 295 (2003).

From the language of § 59H, its context that we have described, and its treatment in other Massachusetts decisions, it appears that the insulation with which the statute covers statements made before a public body, statements made to further a citizen's efforts to gain governmental relief, or statements made to enlist public participation to effect favorable consideration of an issue by a public body, does not protect tangential statements intended, at most, to influence public opinion in a general way unrelated to governmental involvement.

> *Order denying special motion*
> *to dismiss affirmed.*