Sanders, Janet L., J.
This is an action brought by the Islamic Society of Boston (“ISB”) and two individuals seeking damages against seventeen named defendants for defamation and alleged civil rights violations. Eight of these defendants are media entities or individuals reporting for those entities. The remaining nine (the “Non-Media Defendants”) are individuals or groups who the plaintiffs allege orchestrated a media campaign against the ISB’s attempts to construct a mosque in Roxbury. These Non-Media Defendants have now filed a Special Motion to Dismiss under G.L.c. 231, §59H, the “Anti-SLAPP Statute,” contending that their actions were “petitioning activity” within the meaning of that statute. This Court disagrees, and therefore concludes that the Motions must be Denied.
BACKGROUND[2]
The ISB is a charitable religious organization that operates a mosque on Prospect Street in Cambridge, Massachusetts. According to its website, its purpose is to “practice and promote a comprehensive balanced view of Islam” and take the “path of moderation, free of extremism.” Plaintiff Yousef Abou-Allaban is the chairman of the ISB’s Board of Directors. Plaintiff Osama Kandil is the chairman of the Board of the Islamic Society of Boston Trust (the “ISB Trust”), which owns the property on which the Cambridge mosque operates and which has as its sole beneficiary the ISB. Both individual plaintiffs hold doctorate degrees and are United States citizens. Dr. Kandil lives with his family in Virginia (with three of his children now attending MIT), and Dr. Abou-Allaban lived in Massachusetts between 1989 and August 2005.
The ISB came into being in the early 1980s. At some point in the 1990s, the ISB began to look for a new site for its mosque. Its attention was drawn to a vacant parcel of properly across the street from Roxbury Community College (the “College”). This parcel (“Parcel R-14”) was located at King Street, Malcolm X Boulevard and Dudley Street, and and was jointly owned by the City of Boston and the Boston Redevelopment Authority (“BRA”).
1. The Histoiy of Parcel R-14
Parcel R-14 was one of 25 parcels designated by an Urban Renewal Plan (the “Plan”) adopted by the BRA in 1970 and approved by the City Council and Mayor the following year. One of the Plan’s goals was to upgrade, both physically and economically, certain distressed areas in the City through development which would benefit the surrounding community. Almost two decades later, however, Parcel R-14 was still vacant.
In 1990, a land use study conducted by the BRA suggested that Parcel R-14 be designated a “Community Facilities District.” Uses encouraged for such a district included a community center, a place of worship or an adult education centeruses which would be specific to the surrounding community in contrast to “indiscriminate larger institutional uses.” These suggestions were ultimately incorporated into the Roxbury Neighborhood Zoning Amendment, adopted by the Boston Zoning Commission in 1991.
In July 1992, the BRA produced a Request for Proposals (“RFP”) to develop Parcel R-14, including within it a detailed set of guidelines and instructions for potential developers. The College, together with other neighborhood organizations, supported the RFP. On October 31 and November 2, 1992, legal notices appeared in the Boston Herald inviting proposals and emphasizing that the primary objective was to develop Parcel R-14 with a community center “compatible with the delivery of a desirable mix of religious, educations (sic), and cultural services consistent with . . . the Roxbury Neighborhood Zoning Amendment.”
The RFP received only one responsefrom the Muslim Council of Boston (the “Muslim Council”). It proposed to build on Parcel R-14 an Islamic Center, to be composed of a large mosque together with a school. The Muslim Council had had its eye on the site for a few years, since the biggest growth in its membership had come from the Roxbury community. The Muslim Council’s proposal received overwhelming support from neighborhood groups and individuals, including state representative Gloria Fox. On December 22, 1992, the BRA met and voted to accept the Muslim Council as Parcel R-14’s redeveloper.
For the next few years, the project was at a standstill. This was in part because conventional financing was not available: Islamic law prohibits the payment of interest. Other developers submitted proposals but none of them was compatible with the uses contemplated for the site. Then the ISB, in search of a new home, entered the picture.
2. The ISB Development Proposal and the BRA Process
The ISB first came to the attention of the BRA in August 1998, when the Muslim Council recognized the ISB as its partner and asked the BRA to substitute the ISB as the redeveloper of Parcel R-14. The BRA staff considered the proposal and then recommended to the full Board that the substitution be approved. In a memorandum to the Board, the BRA’s planning director noted that the ISB had retained two “highly respected” architects and an environmental firm, with equity funding to be provided by the United Bank of Kuwait. The memorandum described the construction of an Islamic institute as “an historic and important endeavor” which, if the substitution were approved, could proceed as was originally envisioned six years before. On October 29,1998, the BRA voted to approve the substitution.
Over the next year, the ISB went to work to move the redevelopment project (the “Project”) forward. A preliminary environmental assessment detected the presence of petroleum hydrocarbons; the contaminated soil was removed. The ISB also determined which permits it would have to obtain from the public *443 agencies (ranging from the Boston Historical Commission to the Boston Transportation Department) which would necessarily be involved. Finally, the ISB approached various neighborhood organizations about their concerns and, in response, developed a list of public benefits that it intended to offer in connection with the construction of a mosque and community center. These benefits included, among other things, a proposed collaboration between the ISB and the College for the development of a research libraiy and a lecture series on Islam and Islamic law. The ISB also proposed to assist the Roxbuiy Community College Foundation (the “Foundation”) with its ongoing fund raising campaigns.
On July 23, 1999, in accordance with the Boston Zoning Code, the ISB submitted a Project Notification Form which set forth all aspects of the Project, including the public benefits described above. A notice describing the Project appeared in the Boston Herald on the same day, inviting public comment and informing the public where the full text of the Project Notification Form could be found. The BRA received three comments: from the Boston Water and Sewer Commission, the Ciiy of Boston Environmental Department, and from Richard Mertens (himself with the BRA) addressing traffic and air quality impact. Around this same time period, the ISB set up eight meetings to discuss the project with members of the community. Some of these meetings were held on the College campus. A BRA staff memorandum noted that the Project was “nearly unanimously supported.”
On January 12,2000, the Project overcame another hurdle when the BRA voted to issue a Certificate of Compliance “upon successful completion of Article 80 review.” As a result of that vote, the BRA issued a “Scoping Determination,” which invited further public comment. Notice of this decision appeared in the Boston Herald on February 9, 2000.
Over the next few months, the ISB completed the Article 80 review (required for large projects), made progress toward finalizing architectural plans, and provided evidence of equity funding. It also negotiated an agreement with the BRA (the “Term Sheet”) which set forth the terms under which the ISB would purchase Parcel R-14 from the Ci1y. This Term Sheet stated that the purchase price would be paid as follows: $175,000 in cash, an additional amount representing the costs already incurred by the ISB to clean up contamination at the site ($43,820), and the ongoing provision of certain identified public benefits (valued at $465,326). These benefits were the same ones which had been listed in earlier proposals, including the collaboration with the College to provide a libraiy and lecture series.
On August 10, 2000 following a public meeting, the BRA approved the final designation of the ISB as redeveloper of Parcel R-14 and more specifically agreed that it would sell Parcel R-14 to the ISB pursuant to the Term Sheet, to be incorporated into a Cooperation Agreement between the ISB and the BRA at the time of closing. The closing was to take place on or before June 30, 2002. Projected construction costs ran higher than anticipated and, because of a need to redesign some elements, the ISB requested a six-month extension on the closing date. Mayor Thomas Menino wrote a letter on behalf of the ISB to the BRA, and a memorandum from a BRA staff member to the Board noted that the Project continued to enjoy “wide spread communily support.” On June 20, 2002, the BRA approved the extension.
Over the next several months, the ISB worked directly with officials at the College, including its president, to finalize details of the benefits that the ISB would provide. They discussed topics for lecture series, ultimately concluding that the focus should be on the historical development of Islam on the African continent, since this was of particular interest to the College’s student population and the surrounding community. On September 25, 2002, the College and ISB entered into an agreement to provide parking space for the cultural center. Groundbreaking for the Project took place on November 7, 2002, and was reported in both the Boston Globe and in the Boston Herald.
The closing on Parcel R-14 ultimately took place on May 16, 2003. By that time, it had been determined (with the BRA’s approval following a public meeting) that the ISB Trust would be the record' holder of the property and sign the closing documents. The consideration for Parcel R-14 was as described in the Term Sheet. Adding up the cash payment of $175,000 with the public benefits and a credit for money that the ISB had already expended on the environmental cleanup, the consideration exceeded the actual fair market value of Parcel R-14, stated tobe $401,187.50. A Land Disposition Agreement was executed together with a Quitclaim Deed, recorded with the Suffolk County Registiy of Deeds the same day. The ISB’s obligation to provide the public benefits was also incorporated into a Cooperation Agreement between it and the BRA which was executed on May 16, 2003 as well.
3. The Activities of the Non-Media Defendants
Absent from any of the public meetings described above were any of the defendants. Indeed, the Non-Media Defendants contend that none of them even knew about the proposal to build an Islamic Cultural Center until October 3, 2002, when defendant William Sapers learned of the Project. Sapers was a member of the Board of Trustees for the Roxbuiy Community College Foundation (the “Foundation”), which assists the College with fund raising and manages its endowment. At the October 3 meeting, the College’s then-Acting President Randolph Bromeiy briefed the Foundation trustees on the Project and on the upcoming groundbreaking (scheduled for the following *444 month). Sapers laments that, before that date, he and other trustees had been “kept in the dark.”
The Project, however, was far from a secret before then. In addition to the published notices for eveiy meeting of the BRA, the legal notices for every one of its decisions, the advertisements for community meetings in the surrounding neighborhood,[3] and reports in the local newspapers, there were in 2001 alone several articles about the Project appearing in national newspapers as well. On May 19,2001, the Washington Post, for example, reported on how the Project was financed, describing the discount given on Parcel R-14 in exchange for certain services that ISB was to provide to the community, including the College. A similar article appears in the Christian Science Monitor on May 31, 2001. Two months before that, the Boston Globe reported the terms of the proposed sale.
When Sapers did learn about the Project, he had what he described as “concerns and questions.” Of primary concern was Sapers’s belief that an individual by the name of Yousef al-Qaradawi had some association with the ISB and that Sapers believed him to be an “extremist” who “supported suicide bombings in Israel and Palestine and other terrorist activities.” He asked a freelance investigative reporter to look into this; this person (not identified to the Court) responded by faxing him a 2000 tax return for the ISB listing al-Qaradawi as an ISB member, together with typewritten material (from an unknown source) purporting to contain excerpts from al-Qaradawi’s public statements. Around the same time, Sapers made calls to an acquaintance on the Board of Education and to a Foundation employee. Although Sapers asserts that his concerns also extended to the terms on- which Parcel R-14 was to be conveyed to the ISB by the BRA, he did not then (nor at any time) contact anyone with the BRA about those concerns, even though the closing on the Project at that point was six months away.
Sapers raised his concerns at the next Board of Trustees meeting for the Foundation on November 7, 2002. This was the day after the groundbreaking for the Project, which was attended by Mayor Tom Menino and United States Representative Michael Capuano (who had both voiced their public support of the Project). As reflected in the minutes, Board president Williams reminded Sapers and other trustees at the November 7 meeting that their responsibility was to “raise funds for the College, its students and programs,” and “does not extend to direct involvement in the College’s affairs."
Unhappy with this response, Sapers took the information that he had acquired from the unidentified reporter and, on November 18, 2002, faxed a letter to Peter Tye, whom Sapers knew to be a “close friend” of Mayor Menino. The letter attached the material Sapers had got from the reporter and said: “We don’t believe the publicity of a mosque supported by Saudi Arabia and extremist Yousef al-Qaradawi will be helpful to the Mayor’s long-range plans.” Sapers also sent letters over the next few weeks to the College’s Board of Trustees chairman Phillip Clay, a member of the Board of Higher Education, and the chancellor for MIT.[4] These letters did not elicit sympathetic responses. Chairman Clay with the College informed Sapers on January 8, 2003 that the issues concerning land use and Project design were between the ISB and the Ciiy of Boston, not the College. He said that the College would not “act upon prejudgments about the [Islamic] Society or Islam” and that, apart from making sure that the “public benefits” items connected to the Project conformed to the “educational mission” of the College, the Board intended to take no further action in connection with Sapers’s concerns. The Board of Higher Education also wrote Sapers around that same time stating that the Board had no particular role in the matter.
It was at this point that Sapers’s activities in connection with the Project changed. Rather than continue to press his concerns through the Foundation (or to go directly to the BRA with his questions), Sapers turned to defendant Steven Emerson. As the defendants portray him, Emerson is an award-winning investigative journalist and leading authority on terrorism and Islamic extremists groups in America. According to plaintiffs, he is nothing more than a paid polemicist who promotes his anti-Muslim agenda by disseminating poorly researched and outright false information about Islamic groups to media representatives for money.
Sapers asked Emerson for assistance in collecting information about members or former members of the ISB. Emerson and his organization, the defendant Investigative Project, responded by providing Sapers with a report Emerson prepared in the summer of 2002 which asserted, among other things, that plaintiff Kandil had ties to a “terrorist supporting infrastructure in the U.S.” Over the next few months, Emerson put together more material about ISB members. Plaintiffs allege that this material contained false and defamatory statements about them.
Sapers took the information he obtained from Emerson and got in touch with Boston Herald reporter Jonathan Wells. Over the next few months, Sapers and Emerson were in frequent contact with Wells. Wells in turn used the material he received from Sapers and Emerson to write a series of stories about the ISB and the Project, the first of which appeared in the Boston Herald on October 28,2003. These newspaper reports, which asserted that the ISB was directly connected to and funded by radical terrorist organizations, lie at the heart of the plaintiffs’ defamation claim. As to Sapers’s and Emerson’s role in those published reports, the plaintiffs allege that they served as anonymous sources for Wells and knowingly gave him and other reporters false information about the plaintiffs, including information that the ISB funded the terrorist *445 groups of Hamas and Hezbollah, and that the plaintiff Kandil was connected to terrorist training camps and Osama bin Laden.
At the same time, Sapers continued to use his contacts in the mayor’s office to press his agenda. He forwarded one of the Herald articles to the mayor via e-mail with the heading: “CAN’T BELIEVE YOU PRAISED THESE TYPE OF PEOPLE!!!” In January 20, 2004, he wrote to Ttye again, beginning his letter by warning iye that more articles would soon be appearing in the Herald questioning the Mayor’s position on the Project. At the same time, he addressed a separate letter to Menino warning that “as more of this story appears, you and the City of Boston could be very embarrassed.” Although Menino did ultimately raise questions about the Project, the deal had been consummated six months before with the sale of Parcel R-14 to the ISB. There was no ongoing governmental process which could stop it at that point.
In May 2004, Sapers joins forces with defendant Kolodner, who is director of the David Project, as well as with as the remaining Non-Media Defendants. Initially, they referred to themselves only as the “ad-hoc mosque group.” At a first meeting of the group on May 24, 2004 (attended by reporter Wells also) defendant Cohen circulated a document entitled “Preliminary Agenda” which states that the group will conduct a “political and media campaign” against the Project. This theme continued in additional meetings. For example, on September 2, 2004, defendant Kolodner e-mailed members of the group about the “need to develop a media campaign and . . . develop a presentation that can be used with media, politicians, and community groups.” Wells continued to worked closely with the group, sharing information about the ISB and its membersinformation which the plaintiffs say was false.
In addition to a media campaign, this group also discussed a legal challenge to the BRA/ISB transaction. They located an appropriate plaintiff (none of the Non-Media Defendants lived or worked in the neighborhood of Parcel R-14 and therefore had no standing) and the suit, Policastro v. BRA, Civ. No. 04-74292 was ultimately filed in Suffolk Superior Court in September 2004. This lawsuit (brought some sixteen months after the BRA sold Parcel R-14 to the ISB) challenges the terms of that salespeciflcally, the values attached to the public benefits offered by ISB to the College and the overall price at which Parcel R-14 was sold. It also raised a constitutional question about entanglement between church and state. As described in an e-mail, however, defendant Kolodner expressed the hope that this lawsuit “will trip the switch of the larger agenda of exposing the radical fundamentalist underpinnings of the Mosque and its leaders" and would assist the group in its effort to “develop a media campaign” against the Project.
In October 2004, defendants Cohen, Hale and Mansour incorporated an organization called the “Citizens for Peace and Tolerance” (“CPTj, which had as its stated goal the “education of the community about events that may threaten if’more specifically, the ISB’s plans to build a mosque near the College. On the CPT website were direct links to the Herald articles. A press release to announce CPTs formation stated that it was concerned that the ISB and its plan to build an Islamic Center “may be part of a global and national effort by radicals and extremists to control mosques and radicalize their communities.” Defendant Hale simultaneously approached various media outlets, including the Boston Globe and CNN, and appeared on the “700 Club” television program. He and other CPT members held press conferences denouncing ISB and its members and former members, making statements which the plaintiffs allege are false.
By this time, defendant Wells had moved from the Boston Herald to Fox-TV. In the fall of 2004 (picking up on CPTs activities) Fox ran a series of reports about the ISB and the mosquereports which the plaintiffs allege are false and defamatory. Among other things, the broadcasts stated that ISB members were also members of the “oldest radical Islamic organization in the world, the Muslim Brotherhood," described as “the grandfather of Islamic terrorism." A November 16, 2004 broadcast began by stating that this “deadly” organization had “arrived here in Boston” in the form of the ISB. This international organization (it was stated in the TV reports) had started “some of the most notorious terrorist groups” in the world, including A1 Qaeda and Hamas. The Non-Media Defendants remained in close contact with Wells throughout this period and (it is alleged) assisted him and cooperated with him in the preparation of these broadcasts. Some of the defendants also appeared on Fox-TV, making statements of their own about the ISB. For example, Mansour stated that the ISB belonged to the Muslim Brotherhood and therefore was part of a “vey dangerous culture” which dealt with the rest of the world “with violence and in the name of Jihad.” Plaintiffs allege that these news reports were the “product and result” of the defendants’ coordinated media campaign.
Presently, the mosque remains unbuilt, but not because of any governmental process. Although a few public officials did, in response to the media reports, publicly express concern about the Project, this Court is unaware of any ongoing governmental proceedings pertaining to the Project, other than the Policastro suit. In 2004, a City Councillor called for a hearing about the Project before the Council’s audit committee and the Mayor said that he would review it, but there is no evidence before this Court that this led anywhere. More recently, Jeffrey Robbins, an attorney for several defendants in this case, urged City Council to take up the matter again; this Court is not sure what resulted *446 from this post-litigation effort. Although the BRA continues to have some oversight over the Project, this is simply to monitor compliance with the terms of the land sale and the agreements executed in conjunction with that sale. Because there is no indication of any noncompliance, the BRA has taken no action.
The plaintiffs allege that the Project came to a halt because of the very public attack mounted by the defendants on the ISB and its members. According to the plaintiffs, people are afraid to donate to or in any way support the building of the cultural center for fear of being labeled terrorist sympathizers. This alleged damage to the plaintiffs’ reputationand the economic consequences of their public vilificationconstitute the harm for which they seek compensation by this lawsuit. The question before this Court is whether it should be able to proceed beyond the filing of a Complaint.
DISCUSSION[5]
The Anti-SLAPP statute was enacted in 1994 to deter the use of litigation against individual citizens who, by virtue of their participation in governmental processes, become the targets of expensive lawsuits designed to punish them for their petitioning activity. One lawsuit in particular appeared to have been the impetus for the legislation. In 1991, a group of residents from Rehoboth, acting out of a concern for wetlands, signed a petition opposing a permit to build single-family residences. The developer sued, and the residents were forced to incur $30,000 in legal fees before the suit was ultimately dismissed. Concerned about the strategic use of baseless lawsuits like the Rehoboth litigation, the Legislature passed G.L.c. 231, §59F, which very broadly defines the kind of petitioning activity to be protected. Specifically, the statute states that the “right to petition” includes any written or oral statement made “in connection with” an issue under consideration or review by a governmental entity, any statement “reasonably likely to encourage” such consideration or review, and any statement “reasonably likely to enlist public participation in an effort to effect such consideration.”
If these words were taken literally, then the statute would, as the Supreme Judicial Court noted in the leading case of Duracraft Corp. v. Holmes Products Corp., 427 Mass. 156, 161 (1998), alter procedural and substantive law in a “sweeping way.” In addition, a broad definition of “petitioning activity” would have the unintended effect of preventing plaintiffs from exercising their own rights to petition the governmentspecifically the court systemfor redress of a perceived legal wrong. Although the legislature did attempt to limit the reach of the statute by permitting the non-movant to avoid dismissal upon a showing that the moving party’s petitioning activities were “devoid of any reasonable factual support or any arguable basis in law,” the SJC noted that this did little to separate out meritorious suits from frivolous ones. Accordingly, in order to avoid a constitutional issue, the SJC held that the statute must be construed to protect only those parties who can first demonstrate that the claims against them are “based on their petitioning activity alone and have no substantial basis other than or in addition to the petitioning activities.” Duracraft, 427 Mass. at 167-68 (emphasis added). Without that threshold showing, the question of whether the petitioning activity itself has merit need not be reached at all.
Subsequent appellate decisions have further defined what constitutes “petitioning activity” and have also provided guidance as to what must be established by a special movant under Duracrafts holding. The following principles can be gleaned from those cases. First, the special movant must demonstrate that the conduct being challenged by the plaintiff was made in the context of and in order to influence the outcome of a governmental proceeding, or to obtain review from a governmental entity. Thus, for example, in Global NAPs, Inc. v. Verizon New England, Inc., 63 Mass.App.Ct. 600 (2005), it was held that the defendant’s allegedly defamatory statements made to a newspaper that the plaintiffs operation was in essence a “scam” did not constitute petitioning activity, because it was not an integral part of the ongoing legal proceedings between the parties (in that case, the appeal of an arbitration decision) nor was it made to advance any issue involved in those proceedings. Rather, the statements were “tangential” to the legal proceedings, “intended at most to influence public opinion in a general way unrelated to the government involvement.” Id. at 607. Second, the purpose of the defendant’s activity must be to seek redress from the government on his own behalf as a citizen. It was held that this requirement was not satisfied in Kobrin v. Gastfriend, 443 Mass. 327 (2005), where the challenged conduct involved statements that the defendant psychiatrist made about the plaintiff in an affidavit to the Board of Registration in Medicine. Although the affidavit was submitted to a governmental body, the defendant made the statements in his capacity as an expert hired by the Board, not in order to seek redress from the government himself. Third and perhaps most important, if some portion of the complained-of conduct does not fall within the definition of petitioning activity, then the action should not be dismissed. Illustrative of this requirement is Garabedian v. Westland, 59 Mass.App.Ct. 427 (2003), where the plaintiff had sued a group objecting to work the plaintiff was doing on an airstrip and hangar in their neighborhood. The neighbors had complained to state and local officials, protested at city hall and organized public meetings; they had also engaged, however, in intrusive surveillance of the construction and harassed the plaintiffs building contractor. Noting that this latter conduct “involved no supplication to higher authority” within the government, the Appeals Court held that the Anti-SLAPP statute did not *447 apply because the plaintiffs complaint was not based solely on the neighbors’ petitioning activities. Id. at 432-33. See also Ayasli v. Armstrong, 56 Mass.App.Ct. 740, 748 (2002).
Applying these legal principles to the case before me, this Court concludes that the Non-Media Defendants have failed to meet their burden of showing that the subject matter of the plaintiffs’ claims is based solely on the defendants’ “petitioning activity” as that term has been defined by the case law. The Amended Complaint takes primaiy aim at the Non-Media Defendants for their statements to the media, not to any governmental representative. It is alleged that they conspired with the media to spread false and defamatory information about the ISB in order to turn public opinion against it, not to influence any particular governmental proceeding. Clearly, the media defendants cannot claim the protections of the Anti-SLAPP statute. Assuming plaintiffs will be able to prove their allegations of a conspiracy, then it is difficult to understand why the “Non-Media” Defendants can claim such protection simply by asserting their status as private citizens.
More significantly, the complained-of conduct occurred at a time when there was no ongoing government proceeding. The BRA, the only governmental agency involved in this Project, had already closed on the deal by conveying Parcel R-14 to the ISB. At no time, either before or after that conveyance, did the defendants speak to a BRA representative or participate in any of its public hearings. That, as a result of the media campaign, some individuals within the government (including Mayor Menino and Representative Capuano) expressed some concerns about the ISB does not thereby convert everything that the Non-Media Defendants did before that into petitioning activity. “That a statement concerns a topic that has attracted government attention in itself does not give that statement the character contemplated by the statute.” Global NAPs, 63 Mass.App.Ct. at 605. Otherwise, virtually any activity relating to a matter of public interest could be considered “petitioning activity”a construction of the Anti-SLAPP statute which would not accord with the SJC’s holding in Duracraft.
It is true that some Non-Media Defendants did at various points contact government officials other than those at the BRA (for example, the Mayor and City Council), but these contacts are not the sole basis for the plaintiffs’ Complaint, which focuses far more on the Non-Media Defendants’ relationship with the media and their part in news reports about the plaintiffs. As noted above, the movants must demonstrate that the complaint is based solely on their petitioning activity; if some part of the complained-of conduct does not fall within the definition of petitioning activity, the action should not be dismissed. Moreover, the defendants’ activities did not result in any governmental investigation actually being undertaken. A City Councillor called for a hearing, but this went nowhere (the Council’s jurisdiction over the Project being questionable at best). Although the defendants state in their papers that Representative Capuano “publicly called upon” the U.S. Treasury Department to look into the ISB following the Herald reports about the Project, there is no evidence before this Court that any federal investigation of the ISB or its members was begun. Rather, these statements by public officials appear to be only that: statements made for the benefit of the public following inflammatory news reports which any politician would be foolish to ignore.
The defendants point out that whether conduct is “petitioning activity” does not turn on whether their efforts in obtaining government review were successful. This Court agrees. However, the problem with the defendants’ position in this case is not just that they were unsuccessful in generating governmental review but that their complaints were not of the sort capable of being reviewed by any governmental agency at all. The issues that Sapers and others raisedthat ISB members embrace a radical theology, for example, hold extremist views inconsistent with Western values, or have connections with specific individuals identified as terroristsare not matters that can be resolved by a governmental agency, at least not by the City Council of Boston or its Mayor, to whom the Non-Media Defendants claim they directed their efforts. In short, this Court fails to see the connection between the allegedly defamatory statements of the Non-Media Defendants which are the subject of this lawsuit and any issue which was either the subject of governmental review or was capable of being reviewed by a governmental agency.[6]
The Non-Media Defendants argue that they were instrumental in having the Policastro litigation instituted, and that this lawsuit (itself a proceeding before a branch of the government) raises objections to the Project concerning the terms of the salematters which are subject to redress by a court. The plaintiffs point out, however, that none of the Non-Media Defendants are parties in that lawsuit. Because they are not themselves seeking redress from a court on their own behalf (apparently having no standing to do so in the Policastro matter) it is difficult to see how their behind-the-scenes support of that lawsuit converts everything they did into petitioning activiiy. More important, a fair reading of the Complaint suggests that this shit is only one small part of plaintiffs’ grievancesand under Duracraft, that is not enough. The statements which are the subject of the defamation claim in particular do not so much concern the terms of the sale of Parcel R-14 as they do the purported association of ISB members and former members with terrorist organizations (an association with the ISB denies).
In an attempt to meet the requirement that “petitioning activity” constitutes the sole basis for the plaintiffs’ Complaint, the Non-Media Defendants
*448 downplay the statements that they made to media representatives, characterizing them as “mirror images” of the statements that they were making to individuals connected to the government. They rely in particular on a recent Appeals Court decision, Wynn v. Creigle, 63 Mass.App.Ct. 246 (2005). In that case, the defendant, the widow of a firefighter, had pending before the governor a petition for benefits which had been the subject of an ongoing fire department investigation. She then provided a newspaper with documents introduced at the hearing on those benefits, and made certain statements which were essentially identical to those which she had made in order to advance her benefits request. The Appeals Court held that, because her statements to the newspaper were “mirror images” of those already made in the course of the government’s investigation of her claim and were “tied to and in advancement of” her petition for benefits, the Anti-SLAPP statute required dismissal.
In the instant case, the chronology of eventsand the activity which forms the basis for the plaintiffs’ complaintare quite different. The only ongoing government proceeding in existence when the Non-Media Defendants (beginning with Sapers) first engaged in the activities which are the subject of this lawsuit was the BRA proceedings, in which no defendant played any part. The government officials which Sapers had contacted in 2002 and early 2003 had rebuffed him, stating that review of the Project was not their role. Sapers then turned to defendant Steven Emerson and the Investigative Project to collect information about the ISBinformation which Sapers and Emerson then funneled (as anonymous sources) to the media. Thereafter, they and other Non-Media Defendants (it is alleged) worked closely with reporters from the Herald and from Fox-TV behind the scenes in order to publicly brand the ISB as a terrorist organization. That the defendants then took the reports about the plaintiffs which the media had generated with their assistance and forwarded them on to government officials does not thereby convert their media activities into petitioning activities. That would be the equivalent of concluding that the tail wags the dog.
In the final analysis, to accept the defendants’ arguments and conclude that the conduct which is the subject of this litigation constitutes “petitioning activity” shielded by the Anti-SLAPP statute would essentially obliterate the tort of defamation and unfairly tip the scales so as to impinge upon the plaintiffs’ right to themselves petition the government for relief. As the Supreme Court held more than two decades ago, the right to petition is “cut from the same cloth” as the other guarantees of the First Amendment. Although that right is an important aspect of self government, “it does not follow that the Framers of the First Amendment believed that the Petition Clause provides absolute immunity from damages for libel.” McDonald v. Smith, 472 U.S. 479, 485 (1985). The instant case not only involves a claim for libel but it also touches on the right to the free exercise of one’s religion: The Complaint not only alleges that the Non-Media defendants made knowingly false statements about the plaintiffs but also asserts that they were targeted because they were Muslim, in violation of their civil rights. To prevent them from pursuing relief at this early juncture without a more compelling showing on the part of the defendants that they are being sued solely because of their petitioning activity would come dangerously close to applying G.L.c. 12, §59H in an unconstitutional manner.
CONCLUSION AND ORDER
For all the foregoing reasons, and for other reasons articulated in the plaintiffs’ Oppositions to these Motions, the Special Motions to Dismiss under the AntiSLAPP statute are DENIED.

Although this Court has attempted to state the facts in this section only to the extent that they are documented in the record before the Court, these motions are made as motions to dismiss, without the plaintiffs having been afforded discovery. Therefore, to the extent there are significant disputes of fact or the evidence provides a basis for different inferences, this Court construes the evidence relevant to this Court’s conclusions in a light more favorable to the plaintiffs.

That none of the Non-Media Defendants knew of the public meetings is not entirely surprising, since there is no evidence before this Court that any of them live or work in the neighborhood where Parcel R-14 was located. Two of the community meetings held by ISB took place at the College, but Sapers denies knowing about these meetings (illustrating just how limited Sapers’s role was in College affairs).

Only the letter sent to the MIT chancellor was produced for this Court. That letter says only that “I do not understand why the Trustees of Roxbuiy Community College have not disassociated themselves from the Islamic Society of Boston” and alludes to material attached to the letter concerning Qaradawiapparently the same material Sapers had obtained from the freelance reporter.

Legal memoranda submitted by the parties in this case exceed 300 pages. To say the least, they are thorough, citing every court decision conceivably relevant to the issues before the Court. They are also well reasoned. Ultimately, this Court found the plaintiffs’ arguments to be more persuasive. Without attempting to cover every single point raised by the parties, I summarize in this Memorandum of Decision what I found to be the most compelling of the arguments advanced.

The plaintiffs argue that to see the defendants’ conduct as simply “speaking publicly on a development project” (as the defendants characterize it) would be the equivalent of saying that an abutter opposed to a subdivision is engaged in “petitioning activity” where he tells the media that the developer is a child molester. Because the grievance bears no relationship to what might be reviewed by the zoning board, it does not come within the purview of the Anti-SLAPP statute. While this analogy may be a bit extreme, the point is a good one: there is no clear relationship here between the Non-Media Defendants’ allegations about the ISB and any particular governmental proceeding that could be undertaken.