NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12082

CARDNO CHEMRISK, LLC  vs.  CHERRI FOYTLIN & another.[1]


Suffolk.     October 7, 2016. - February 14, 2017.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, & Budd, JJ.


"Anti-SLAPP" Statute.  Practice, Civil, Motion to dismiss.


Civil action commenced in the Superior Court Department on December 16, 2014.

A special motion to dismiss was heard by Edward P. Leibensperger, J.

The Supreme Judicial Court granted an application for direct appellate review.


John H. Reichman, of New York (James E. Grumbach also present) for the defendants.
Megan L. Meier, of Virginia (Samuel Perkins also present) for the plaintiff.
Thomas R. Sutcliffe, Jeffrey J. Pyle, & Sarah R. Wunsch, for American Civil liberties Union of Massachusetts, amicus curiae, submitted a brief.

---

[1] Karen Savage.

LENK, J.  On April 20, 2010, an oil rig operated by British Petroleum (BP), known as Deepwater Horizon, suffered a catastrophic explosion causing approximately 4.9 million barrels of oil to flow into the Gulf of Mexico, some forty miles off the coast of Louisiana.  Three and one-half years after the oil spill, and during the ensuing multidistrict Federal litigation in New Orleans regarding BP's liability for it, the defendants, both environmental activists, contributed an article appearing in the Huffington Post, an Internet Web site.  That article, also known as a "blog posting," contained criticism of the plaintiff, Cardno ChemRisk, LLC (ChemRisk), a scientific consulting firm that BP had retained to assess the toxic effects of the oil spill on cleanup workers.  ChemRisk maintains that certain of these criticisms constitute actionable defamation.

ChemRisk brought claims for defamation against both defendants, in Massachusetts and in New York.[2]  The defendants filed a special motion to dismiss the Massachusetts suit under G. L. c. 231, § 59H, the "anti-SLAPP" statute.  A Superior Court judge denied the motion, concluding that insofar as the Internet blog posting at issue did not concern or seek to advance the defendants' own interests, but rather those of the cleanup workers, the defendants had not met their threshold burden of

_____

[2] The Huffington Post, at the time, was incorporated in and had its principal place of business in New York.

showing that the suit was based exclusively on the "exercise of [their] right of petition under the [C]onstitution," as that phrase has been interpreted in our case law. G. L. c. 231, § 59H. We conclude, to the contrary, that the defendants were engaged in protected petitioning activity, which was the sole basis of the plaintiff's defamation claim, and therefore they have met their threshold burden. On the record before us, the plaintiff cannot show, as it must in order to defeat the special motion, that such petitioning was devoid of reasonable factual support or arguable basis in law. We accordingly reverse.[3]

1. Background. The pertinent facts taken from the pleadings and affidavits of record are these.[4] ChemRisk is a scientific consulting company that produces reports and provides expert testimony for clients concerning the environmental risks of their products. In one such report, ChemRisk scientists examined the extent to which cleanup workers responding to the Deepwater Horizon spill had been exposed to the chemicals benzene, toluene, ethylbenzene, and xylene (collectively known as BTEX). ChemRisk concluded that such exposure was

---

[3] We acknowledge the amicus brief submitted by the American Civil Liberties Union of Massachusetts.

[4] See G. L. c. 231, § 59H (in ruling on anti-SLAPP special motion, "the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability is based").

substantially below permissible limits set by the Occupational Safety and Health Administration.

Defendant Cherri Foytlin, a life-long resident of the affected region, works full time as an environmental activist. Defendant Karen Savage also participates in environmental advocacy. Since the occurrence of the oil spill in 2010, both defendants have devoted substantial time to exploring its environmental consequences, particularly its effects on cleanup workers, and to advocating on behalf of those adversely affected. One of their efforts in this regard was to write a piece entitled "ChemRisk, BP and Purple Strategies: A Tangled Web of Not-So-Independent Science" that appeared on the Huffington Post's "Green Blog," in which they challenged ChemRisk's BTEX report. The "Green Blog" described itself as "[f]eaturing fresh takes and real-time analysis," and the article appeared there on October 14, 2013, under the byline "Cherri Foytlin, Gulf Coast based author and journalist," along with a note that "Karen Savage contributed to this article."

The article begins by discussing then-ongoing Federal litigation against BP taking place in the United States District Court for the Eastern District of Louisiana, in which, among other things, BP's experts contested the extent of the damages

caused by the spill.[5]  The article asserts that BP and the environmental experts it employs do "not exactly have a reputation for coming clean on the facts."

The defendants then discuss ChemRisk's BTEX report as an example of BP's experts not "coming clean," referring to the study as "independent" and "science" (both in quotation marks). The article goes on to claim, in the passage alleged to be defamatory, that ChemRisk, in connection with an unrelated scientific study unflattering to a different client, had engaged in deceptive tactics:

> "As it turns out, ChemRisk has a long, and on at least one occasion fraudulent, history of defending big polluters using questionable ethics to help their clients avoid legal responsibility for their actions.

> "One well known example is the case that became the basis for the movie Erin Brokovich, where the polluter and defendant Pacific Gas and Electric (PG & E) was found to have paid ChemRisk to discredit research done by Chinese scientist Dr. Jian Dong Zhang.

> "In an earlier study, Zhang had found strong links between chromium-6, which was found in Hinkley, California's drinking water, and cancer.  ChemRisk obtained Dr. Zhang's data, and without his knowledge, intentionally manipulated the findings to contradict his own earlier studies.

> "The erroneous data was then submitted to the Journal of Occupational and Environmental Medicine (JOEM) as though it had been re-worked by Dr. Zhang personally."[6]

---

[5] In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, U.S. Dist. Ct., MDL No. 2179 (E.D. La.).

The article closes by asking whether "anyone will ever . . . make [things] right" in the Gulf Coast.

In response to the blog posting, a ChemRisk representative wrote by electronic mail to the Huffington Post demanding a retraction, and an editor forwarded the message to Foytlin.  She responded that she did not believe the piece contained factual errors, and it remained posted on the site, where it drew comments from readers.  In April, 2014, six months after the article appeared, ChemRisk filed a defamation action in a New York State court against Foytlin and Savage.  In December, 2014, while that case was pending, ChemRisk filed another defamation suit, based on the same set of facts, in the Massachusetts Superior Court.  After a judge of the New York Supreme Court allowed the defendants' motion to dismiss for lack of personal jurisdiction, ChemRisk amended its complaint in Massachusetts, and engaged in discovery.

In August, 2015, the defendants filed a special motion to dismiss under the anti-SLAPP statute,[7] asserting that the claim against them was based solely on their exercise of the right to

---

[6] Other publications had made substantially similar allegations.  See note 17, infra.

[7] Both defendants also moved to dismiss for failure to state a claim, and Cherri Foytlin moved to dismiss for lack of personal jurisdiction.  Those motions were denied, and the defendants did not appeal from the denials.

petition, that they had a reasonable factual basis for their statements, and that they caused no injury. See Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 167-168 (1998) (Duracraft). Relying on this court's decision in Fustolo v. Hollander, 455 Mass. 861 (2010), the judge determined that because the defendants were not seeking to redress a grievance of their own, they were not engaged in protected petitioning activity. He therefore denied the motion without reaching the questions whether the defendants' statements had a reasonable basis in fact or whether they caused actual injury. The defendants filed an interlocutory appeal, see Fabre v. Walton, 436 Mass. 517, 521-522 (2002), S.C., 441 Mass. 9 (2004), and we granted their application for direct appellate review.[8]

2. Discussion. ChemRisk contends that the anti-SLAPP statute offers the defendants no protection. Because their article did not address a grievance personal to them, ChemRisk argues that the defendants were not exercising their right to

_____

[8] After the defendants filed their notice of interlocutory appeal, they unsuccessfully moved to stay discovery in the Superior Court pending appeal; ChemRisk opposed the motion. The defendants complied with the extant discovery order. Shortly after direct appellate review was allowed, and ChemRisk's own discovery responses were due, ChemRisk indicated its intention voluntarily to dismiss the action pursuant to Mass. R. Civ. P. 41 (a) (2), 365 Mass. 803 (1974). The defendants opposed the dismissal. The judge subsequently denied ChemRisk's motion, reasoning that the defendants' special anti-SLAPP motion seeking attorney's fees and costs constituted "for all intent[s] and purposes, a counterclaim that remains alive."

petition, as required by the statute.  We disagree.  Such a constrained view of the right of petition, a right the anti-SLAPP statute exists to protect, is without basis in the United States or Massachusetts Constitution or in our case law.

a.  Statutory background.  The object of a SLAPP[9] suit is not necessarily to prevail, but rather, through the difficulty and expense of litigation, to discourage and intimidate individuals from exercising their constitutional right of petition.  See Duracraft, 427 Mass. at 161.  Although not limiting the statute to such cases, the Legislature enacted G. L. c. 231, § 59H, primarily to protect "citizens of modest means" who speak out against larger, more powerful entities.[10] See id.  The statute allows a defendant who believes he or she has been targeted in a SLAPP suit to file a special motion to dismiss that suit prior to completing discovery, thereby "provid[ing] a quick remedy" against the time and cost of otherwise protracted litigation.  Kobrin v. Gastfriend, 443 Mass. 327, 331 (2005).  A defendant who prevails on the special

---

[9] SLAPP is an acronym for "strategic lawsuits against public participation."  See Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 159-160 & n.7 (1998), (Duracraft).  See also G.W. Pring & P. Canan, SLAPPs:  Getting Sued for Speaking Out 3 (1996).

[10] Foytlin is a mother of six supporting herself with modest monthly stipends; she lives in Louisiana less than fifty miles from the affected portion of the Gulf Coast shore.  Karen Savage is a single mother of four who, at the relevant time, worked as a middle school teacher in the Roxbury section of Boston.

motion to dismiss is to be awarded attorney's fees and costs.
See G. L. c. 231, § 59H.

The special motion procedure employs a two-stage framework.
See Duracraft, 427 Mass. at 167-168.  First, the special
movants, here the defendants, must establish that the nonmoving
party's claim is based solely on the special movant's protected
petitioning activity.  If the special movant so establishes, the
burden shifts to the nonmoving party.  To withstand the special
motion to dismiss, the nonmoving party must show, by a
preponderance of the evidence, that the special movant's
petitioning activity was devoid of any reasonable factual or
legal support and that it caused the nonmoving party actual
injury.  See Baker v. Parsons, 434 Mass. 543, 544 (2001);
Duracraft, supra at 168; G. L. c. 231, § 59H.

The anti-SLAPP statute provides protection, by its terms,
wherever "civil claims . . . against [a] party are based on said
party's exercise of its right of petition under the
[C]onstitution of the United States or of the [C]ommonwealth."
G. L. c. 231, § 59H.  The statute defines the "exercise of [the]
right of petition"[11] to include

_____

[11] The First Amendment to the United States Constitution
protects "the right . . . to petition the [g]overnment for a
redress of grievances," along with the right to "free exercise"
of religion, "freedom of speech," freedom "of the press," and
"the right . . . peaceably to assemble."  Unlike similar
statutes in other States, the Massachusetts anti-SLAPP statute

"[1] any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; [2] any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; [3] any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; [4] any statement reasonably likely to enlist public participation in an effort to effect such consideration; or [5] any other statement falling within constitutional protection of the right to petition government."

Id.

While this definition is "very broad," Duracraft, 427 Mass. at 162, it has been limited by our construction of the statutory phrase "said party's exercise of its right of petition." G. L. c. 231, § 59H (emphasis added). We have taken this phrase to mean that one seeking the protection of the statute must show that he or she has "petition[ed] the government on [his or her] own behalf . . . in [his or her] status as [a] citizen." Kobrin, 443 Mass. at 332. Put another way, the petitioning at issue must be of the kind contemplated by the United States and Massachusetts Constitutions. See id. at 334; Fisher v. Lint, 69 Mass. App. Ct. 360, 364 (2007). Thus, to meet the threshold burden for its special motion dismiss, the special movant must show that its claimed petitioning activity falls within one or

protects only the "right of petition," G. L. c. 231, § 59H, not all First Amendment rights. See Fustolo v. Hollander, 455 Mass. 861 871, n.12 (2010), citing Cal. Civ. Proc. Code § 425.16 (West 2004 & Supp. 2010).

more of the five statutorily enumerated categories; that such exercise was petitioning in the constitutional sense, i.e., undertaken as the exercise of the special movant's right of petition; and that it formed the sole basis of the nonmoving party's claim.

b. <u>Defendants' threshold burden</u>. Thus, in order to prevail on the special motion to dismiss, Foytlin and Savage must show that the Huffington Post article qualifies as petitioning activity within one or more of the statutory definitions, that the article was an exercise of their own right of petition, and that there was no basis for ChemRisk's defamation claim other than the statements in the article.[12]

i. <u>Statutory categories</u>. The Huffington Post blog posting falls within at least one of the enumerated definitional categories. It formed part of the defendants' ongoing efforts to influence governmental bodies by increasing the amount and tenor of coverage around the environmental consequences of the spill,[13] and it closes with an implicit call for its readers to

---

[12] ChemRisk does not dispute that its complaint is based exclusively on the Huffington Post article. Its single-count defamation complaint points only to the four paragraphs quoted <u>supra</u>.

[13] In addition to writing the blog posting at issue, the defendants have worked to raise awareness of the consequences of the spill by, among other things, marching from New Orleans to Washington, D.C.; drafting press releases; meeting with Federal officials; and corresponding with Federal agencies such as the

take action.  Given this, the article fits squarely within the

second clause of G. L. c. 231, § 59H:  "any statement reasonably

likely to enlist public participation."

In addition, it was written against the backdrop of

multidistrict litigation pending against BP, and referred to

that litigation and to BP's efforts to limit its liability for

the spill.  The article noted, specifically, the actions of one

of BP's experts, ChemRisk.  Given this, it may fit within the

second clause of G. L. c. 231, § 59H:  "any written . . .

statement made in connection with an issue under . . . review by

a . . . judicial body."  This language includes communications

"closely and rationally related to the [judicial] proceedings,"

Plante v. Wylie, 63 Mass. App. Ct. 151, 159 (2005), that are

"made to influence, inform, or at the very least, reach

[judicial] bodies -- either directly or indirectly" (citation

omitted).  North American Expositions Co. Ltd. Partnership v.

Corcoran, 452 Mass. 852, 861 (2009).

ii.  Defendants' exercise of their own right of petition.

In three cases in our jurisprudence, Kobrin, 443 Mass. at 328,

Fisher, 69 Mass. App. Ct. at 361, and Fustolo, 455 Mass. at 861-

Department of Justice, the Environmental Protection Agency, the
Occupational Safety and Health Administration, the Department of
Health and Human Services, the Centers for Disease Control and
Prevention, and the National Institute of Environmental Health
Sciences.

862, activities that met at least one of the statutorily enumerated categories were nonetheless held not to be protected petitioning because such activities were not established to be the special movant's exercise of "its [own] right of petition." G. L. c. 231, § 59H.  Using the language of Kobrin, 443 Mass. at 332, in each instance, the special movant was determined not to have petitioned on its "own behalf" or in its "status as [a] citizen[]."  Each such case involved circumstances not present here:  the special movants in those cases spoke in the capacity of either a contracted government expert witness, Kobrin, 443 Mass. at 329; a government employee, Fisher, 69 Mass. App. Ct. at 360; or a journalist charged with objectively reporting the news, Fustolo, 455 Mass. at 862.  In so doing, they were not speaking for themselves, but in a different capacity.  As such, they were not exercising their own constitutional right of petition, as they must in order to claim protection under the statute.  Nothing, however, in the history of the constitutional right to petition, or in those cases, suggests that the right of petition protected by the anti-SLAPP statute is limited to seeking redress of purely personal grievances.

A.  Constitutional history.  The United States Constitution protects the right to petition to redress grievances whether those grievances be private or public in nature.  "[T]he right[] . . . to petition for a redress of grievances [is] among

the most precious of the liberties safeguarded by the Bill of Rights."  United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n, 389 U.S. 217, 222 (1967).  It has been a fundamental aspect of liberty for the better part of 1,000 years:  first to petition the King, then Parliament, then the colonial Legislatures, and finally the institutions of our own government.  See generally Mark, The Vestigial Constitution: The History and Significance of the Right to Petition, 66 Fordham L. Rev. 2153 (1998).  Never in that time has the right been confined to petitions seeking to redress grievances that are either purely personal or purely public in nature.  See id. at 2166-2167, 2182, 2184, 2196, 2207, 2226-2228.

In the first eighty years of this Republic, for example, petitions flooded Congress on many topics.  Among the most prominent were petitions regarding one matter of personal concern -- the payment of individual Revolutionary War pensions -- and those regarding one of public concern -- the abolition of slavery.  See Higginson, A Short History of the Right to Petition Government for the Redress of Grievances, 96 Yale L.J. 142, 158-165 (1986) (discussing abolitionist petitions); Keenan, Discretionary Justice:  The Right to Petition and the Making of Federal Private Legislation, 53 Harv. J. Legis. 563, 585-590 (2016) (discussing war pension petitions).  The absolute right to present these petitions

regardless of subject matter was never questioned.  See Higginson, supra at 159.

B.  Case law.  Our cases recognize that the anti-SLAPP statute, like the constitutional right it safeguards, protects those looking to "advanc[e] causes in which they believe" (citation omitted), Hanover v. New England Reg'l Council of Carpenters, 467 Mass. 587, 594 (2014), as well as those seeking to protect their own private rights.  See Duracraft, 427 Mass. at 164.  This is so because it is the right of petition as such that the statute seeks to protect.  See, e.g., Hanover, 467 Mass. at 594.  To meet its threshold burden, a party bringing a special motion to dismiss must be exercising his or her own constitutional right of petition, but need not be the beneficiary of the particular cause the party seeks to advance.  See Kobrin, 443 Mass. at 332 n.8.

In this light, we have held that the statute protects nonself-interested petitioning on behalf of the environment, much like the petitioning at issue here.  See Baker, 434 Mass. at 545-546 (biologist spoke to Federal and State agencies expressing her opinion that island in Plymouth Bay provided vital bird habitat and her hope that government agencies would protect site).  The Baker decision finds support in the fact that, as this court previously has acknowledged, the Legislature enacted the anti-SLAPP statute with antidevelopment activists in

mind, many of whom were focused on protecting natural resources.[14]  See Kobrin, 443 Mass. at 336, 337 n.11; Duracraft, 427 Mass. at 161.  The decisions in Kobrin, Fisher, and Fustolo are not to the contrary.

In Kobrin, 443 Mass. at 332 n.8, 340, we drew a distinction between people who engaged in petitioning activity "in their own right" and the defendant in that case, whom we classified as simply a "vendor[] of services."  One in the latter group does not exercise "its right to petition" (emphasis supplied).  G. L. c. 231, § 59H.  While holding that an expert witness retained to investigate and testify on behalf of the government could not claim the protection of the anti-SLAPP statute, the court in Kobrin reiterated the principle that petitioners need not act in their own self-interest.  See id. at 339-340 (reaffirming holding in Baker despite those defendants' lack of personal stake).  The defendant in Kobrin fell outside the ambit of the statute because he was not exercising his own constitutional right, but instead had entered into a "mere[ly] contractual" relationship to vend his skills and knowledge to the government.  Id. at 338.  The defendants here, far from having a "merely

_____

[14] The catalyst for the introduction of the anti-SLAPP legislation was an incident in 1991 in which a developer sued several residents of Rehoboth, who had engaged in petitioning activity concerning the developer's effects on wetlands that drained into the Palmer River.  See Duracraft, 427 Mass. at 161. The residents incurred more than $30,000 in legal fees prior to the suit's dismissal nine months later.  Id.

contractual" commitment to Gulf Coast cleanup, have the same type of independent interest in their cause that the Baker defendants did.

In Fisher, the Appeals Court applied the reasoning of Kobrin to another case involving a witness speaking in his capacity as an employee of the government. There, the court held that a police officer, ordered to investigate a fellow officer for an internal affairs hearing, was simply carrying out the duties of his job -- duties specifically assigned to him by his superior -- rather than exercising any constitutional right of his own. See Fisher, 69 Mass. App. Ct. at 364-365.

Fustolo, on which the plaintiff places particular reliance, extends the logic of Kobrin and Fisher to a journalist carrying out a specific assignment. In so doing, she, too, was not seeking to redress a grievance "of [her] own." Fustolo, 455 Mass. at 867. The staff reporter in question in that case worked for a local newspaper, and was sued for defamation for reporting on proposed development projects at local properties owned by Fustolo. The reporter was employed to write, and did write, impartial news articles, despite having personal views on the same subjects. See id. at 862. As we explained, the reporter

> "expressly stated in her affidavit that in writing all her
> articles, she was 'always careful to present an objective
> description of the subject matter, including the positions

> of both sides where applicable,' and that while she had
> personal views on the issues she covered, 'they were not
> reflected in the articles [she] wrote.'"

Id. at 867.  This objectivity was pivotal to the decision

insofar as the reporter was not exercising her own

constitutional right to petition when authoring the challenged

articles.  See id.

c.  Reasonable basis in fact.  Because they expressed their

own opinions, speaking for themselves and at their own behest,

Foytlin and Savage have established that they exercised their

own right to petition when they wrote the article at issue.

Having satisfied their threshold burden, the burden shifts to

the nonmoving party, here ChemRisk, who, to defeat the special

motion to dismiss, must show by a preponderance of the evidence

that the allegations in the blog posting were devoid of any

reasonable factual support or arguable basis in law.[15]  See G. L.

c. 231, § 59H.  It has not done so, having provided minimal

evidence that the defendants lacked a reasonable basis in fact

for the challenged statements.[16]

---

[15] Although the motion judge did not perform this analysis,
we reach the question because "only one conclusion is possible
on this record."  See Adams v. Whitman, 62 Mass. App. Ct. 850,
858 (2005).

[16] ChemRisk attached to its unverified complaint a letter
apparently from Dr. Jian Dong Zhang, the author of the study
that was the subject of the allegedly defamatory statements,
suggesting that he agreed with ChemRisk's later analysis.  Given
the defendants' verified submissions to the contrary, that

Foytlin and Savage, by contrast, offered verified support for their special motion to dismiss, each detailing in affidavits the basis for the challenged statements.  Foytlin, for example, referenced in and attached to her affidavit a series of articles appearing in scholarly journals and reputable newspapers, and other Internet blog postings.  These articles and blog postings provide factual support for the defendants' characterizations of ChemRisk's practices, and also contain assertions similar to those made by the defendants concerning those practices.[17]  Foytlin further averred that the journal that

---

letter fails to demonstrate by a preponderance of the evidence that the challenged statements were "devoid of any reasonable factual support."  G. L. c. 231, § 59H.

[17] See Heath, Center for Public Integrity, How Industry Scientists Stalled Action on Carcinogen (Mar. 13, 2013); Egilman, Commentary:  Corporate Corruption of Science -- The Case of Chromium(VI), 12 Int'l J. Occup. Envtl. Health 169 (2006); Waldman, Medical Journal to Retract Study:  Firm's Consultants Conducted Research, not Chinese Doctors, Wall St. J. (June 6, 2006); Waldman, Study Tied Pollutant to Cancer; Then Consultants Got Hold of It:  "Clarification" of Chinese Study Absolved Chromium-6; Did Author Really Write It?, Wall St. J. (Dec. 23, 2005); Chrome-Plated Fraud: The ChemRisk Documents, Environmental Working Group (Dec. 23, 2005), http://www.ewg. org/research/chrome-plated-fraud [https://perma.cc/B7WT-A9PW]; Michaels, A Chrome-Plated Controversy, The Pump Handle (Dec. 7, 2006), https://thepumphandle.wordpress.com/2006/ 12/07/a-chrome-plated-controversy [https://perma.cc/3EPD-D84M]. See also Roe & Callahan, "Flat-out Deceptive": Distortion of Science Helped Industry Promote Flame Retardants, Downplay the Health Risks, Chicago Tribune (May 9, 2012) (Pulitzer Prize-nominated article accusing ChemRisk of distorting different study on behalf of clients); Lane, Weakened Rules a Boon to 3 Polluters:  Work of Scientist Paid by the Firms Viewed

had published the ChemRisk study, criticized by the defendants in their Huffington Post piece, later retracted the article. Given ChemRisk's failure to offer evidence that would establish the absence of any reasonable factual support for the challenged statements, it cannot withstand the defendants' special motion to dismiss ChemRisk's defamation suit brought against them. That motion must be allowed.

3. Conclusion. The denial of the special motion to dismiss is reversed, and the case is remanded to the Superior Court for the entry of a judgment consistent with this opinion and for the award of reasonable attorney's fees and costs. The defendants also may file an appropriate application for appellate fees and costs in this court, pursuant to Fabre v. Walton, 441 Mass. 9, 10 (2004).

So ordered.

---

Skeptically by Other Experts, Newark Star-Ledger (Mar. 7, 2004) (reporting on ChemRisk's chromium research in other contexts).