NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12141

LYNNE BLANCHARD & others[1] vs. STEWARD CARNEY HOSPITAL, INC., &
others.[2]


Suffolk.     November 7, 2016. - May 23, 2017.

Present: Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, &
Budd, JJ.[3]


"Anti-SLAPP" Statute. Constitutional Law, Right to petition
    government. Practice, Civil, Motion to dismiss. Words,
    "Based on."


Civil action commenced in the Superior Court Department on
May 24, 2013.

Special motions to dismiss were heard by Linda E. Giles, J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

---

[1] Gail Donahoe, Gail Douglas-Candido, Kathleen Dwyer, Linda
Herr, Cheryl Hendrick, Kathleen Lang, Victoria Webster, and
Nydia Woods.

[2] Steward Hospital Holdings, LLC; Steward Health Care
System, LLC; and William Walczak.

[3] Justice Botsford participated in the deliberation on this
case prior to her retirement.

Jeffrey A. Dretler (Joseph W. Ambash also present) for the defendants.
Dahlia C. Rudavsky (Ellen J. Messing also present) for the plaintiffs.
Donald J. Siegel & Paige W. McKissock, for Massachusetts AFL-CIO, amicus curiae, submitted a brief.

LENK, J.  In the spring of 2011, following reports of abuse at the adolescent psychiatric unit (unit) of Steward Carney Hospital, Inc., then president of the hospital, William Walczak, fired all of the registered nurses and mental health counsellors who worked in the unit.  Walczak subsequently issued statements, both to the hospital's employees and to the Boston Globe Newspaper Co. (Boston Globe), arguably to the effect that the nurses had been fired based in part on their culpability for the incidents that took place at the unit.  The plaintiffs, nine of the nurses who had been fired, then filed suit against the defendants for, among other things, defamation.

The hospital defendants[4] responded by filing a special motion to dismiss the defamation claim pursuant to G. L. c. 231, § 59H, the "anti-SLAPP" statute.  A Superior Court judge denied the motion, concluding that the hospital defendants had failed

---

[4] For convenience and, in particular, to distinguish them from other defendants who were named in the complaint but are not part of this appeal, we refer to Steward Carney Hospital, Inc. Steward Hospital Holdings, LLC, Steward Health Care System, LLC, and William Walczak as "the hospital defendants" or "the defendants."

We refer to the plaintiffs as "the plaintiff nurses," "the nurses," or "the plaintiffs" interchangeably as well.

to meet their threshold burden of showing that the claim was based solely on their petitioning activity. The hospital defendants filed an interlocutory appeal in the Appeals Court as of right. See Fabre v. Walton, 436 Mass. 517, 521-522 (2002). The Appeals Court then reversed the motion judge's decision in part. See Blanchard v. Steward Carney Hosp., Inc., 89 Mass. App. Ct. 97, 98 (2016). We granted the parties' applications for further appellate review. We conclude that a portion of the plaintiff nurses' defamation claim is based solely on the hospital defendants' petitioning activity. The hospital defendants as special movants thus having satisfied in part their threshold burden under Duracraft v. Holmes Prods. Corp., 427 Mass. 156, 167-168 (1998) (Duracraft), the matter must be remanded to the Superior Court where the burden will shift to the plaintiff nurses to make a showing adequate to defeat the motion.

Under current case law, the plaintiff nurses, as nonmoving parties, could defeat the special motion only by showing that the hospital defendants' petitioning activity upon which a portion of the plaintiff's defamation claim is based was a sham, i.e., without a reasonable basis in fact or law, a showing that the record suggests may be difficult to make. Insofar as the record also suggests the possibility that the plaintiff nurses' claim may not have been brought primarily to chill the hospital

defendants' legitimate exercise of their right to petition, however, the case underscores a long recognized difficulty in the statute. It is one rooted in the fact that both parties enjoy the right to petition, including the right to seek redress in the courts. The anti-SLAPP statute is meant to subject only meritless SLAPP suits to expedited dismissal, yet it nonetheless may be used to dismiss meritorious claims not intended primarily to chill petitioning.

Because the statute as thus construed remains at odds with evident legislative intent, and continues to raise constitutional concerns, we take this opportunity to augment the framework set forth in the Duracraft case (Duracraft framework) by broadening the construction of the statutory term "based on." While a nonmoving party may still defeat a special motion to dismiss by demonstrating that the special movant's petitioning activity is a sham, we hold that a nonmoving party's claim also is not subject to dismissal as one solely based on a special movant's petitioning activity if the nonmoving party can establish that its claim was not "brought primarily to chill" the special movant's legitimate exercise of its right to petition. See Duracraft, 427 Mass. at 161 (1998), quoting 1994 House Doc. No. 1520. On remand, the plaintiff nurses may attempt to make such a showing in satisfaction of their burden.

1.  Background.  The unit at Steward Carney Hospital, Inc., in Boston (hospital), is licensed by the Department of Mental Health (DMH) and the Department of Public Health (DPH).[5]  In April, 2011, there were four incidents involving alleged patient abuse or neglect at the unit.  The hospital immediately reported these incidents to DMH, DPH, and the Department of Children and Families.  DMH commenced an investigation into the incidents, and required that there be no new admissions to the unit.  DMH also considered revoking the hospital's license to operate the unit pending the hospital's response to the reports of abuse.

The hospital soon placed all but a small number of unit employees, including managers, nurses, and mental health counsellors, on paid administrative leave.  It also hired Scott Harshbarger, then senior counsel at the law firm Proskauer Rose LLP, to conduct an investigation into the incidents, to recommend remedial actions, and to represent the hospital's interests in its dealings with the State agencies.  Upon concluding his investigation, Harshbarger recommended to Walczak that, in light of what he termed a "code of silence" amongst the unit's staff, "it would be prudent to replace the current

_____

[5] The unit typically treats mentally and physically challenged teenagers in "acute states," who are admitted from other facilities as a "last resort."  Many of them are under the custody of the Department of Children and Families and have little involvement with their families.

personnel in order to ensure quality care for these vulnerable patients."

After reviewing Harshbarger's recommendation, Walczak informed each of the plaintiff nurses that he was terminating her employment. The following day, he sent an electronic mail (e-mail) message to all hospital employees, which began by noting that the hospital "has a rich tradition of providing excellent care to [its] patients." After providing the hospital's employees with credit for this successful commitment to patient care, the message continued, in relevant part:

> "Recently, I have become aware of the alleged incidents where a number of [hospital] staff have not demonstrated this steadfast commitment to patient care. I have thoroughly investigated these allegations and have determined that these individual employees have not been acting in the best interest of their patients, the hospital, or the community we serve. As a result, I have terminated the employment of each of these individuals."

In a Boston Globe article about the incidents two days after the plaintiff nurses were fired, Walczak was quoted as saying that, when he read Harshbarger's report, he "decided to replace the nurses and other staff on the unit."[6] Walczak said that the report recommended that he "start over on the unit" and that his "goal [was] to make it the best unit in the state." The article noted that Walczak "would not provide details of the

---

[6] The article stated that Harshbarger had been investigating an employee's alleged sexual assault of a patient and "conditions on the 14-bed locked unit for extremely troubled teens."

alleged assault or patient safety concerns, or comment on why the entire staff was dismissed, given that the allegation involved one employee and one patient." Approximately one month later, the Boston Globe published another article on the incidents at the hospital, quoting Walczak as stating that "[t]he Harshbarger report indicated it wasn't a safe situation" and stating that the report "underscored his decision to fire the entire staff of the unit."

In June, 2011, DMH issued its reports on each of the four incidents. The reports concerning the first three incidents concluded that there had been wrongdoing by a single mental health counsellor, while the fourth report concluded that unspecified staff on duty during the incident had acted improperly.[7]

2. _Prior proceedings_. In May, 2013, in a five-count complaint brought against the hospital defendants, along with

---

[7] In May, 2011, the union that represented the plaintiff nurses, the Massachusetts Nurses Association, filed grievances on behalf of each of the unit's nurses, including each of the plaintiff nurses. Pursuant to the collective bargaining agreement between the hospital and this nurses association, the grievances were subject to arbitration. The first arbitration involved five of the plaintiff nurses: Douglas, Hendrick, Herr, Lang, and Woods. The arbitrator found in favor of the nurses and ordered, inter alia, their reinstatement. The hospital appealed from that ruling; the appeal is apparently still pending.

Harshbarger and Proskauer Rose LLP (Proskauer defendants),[8] the plaintiff nurses claimed that the hospital defendants and the Proskauer defendants had each defamed them. The plaintiff nurses alleged, in one count of their complaint, that the hospital defendants defamed them both by the e-mail message sent to hospital employees announcing their terminations, as well as by communications made to and published by the Boston Globe. The plaintiff nurses asserted that such statements falsely suggested that "after a thorough investigation, [Walczak] had determined . . . that each of the terminated plaintiffs had demonstrated inadequate commitment to patient care and that each had provided such deficient patient care that her employment had to be terminated."[9]

In their defamation claim against the Proskauer defendants, the plaintiff nurses asserted that Harshbarger's preliminary and

---

[8] The complaint also included a claim against the hospital defendants for violation of the healthcare provider whistleblower statute, G. L. c. 149, § 187, and plaintiffs Lang and Donahoe claimed that the hospital defendants retaliated against them for performing their obligations under the mandatory reporting statute, G. L. c. 119, § 51A. In addition, all of the plaintiff nurses asserted a claim of intentional or reckless infliction of emotional distress against Harshbarger and Proskauer Rose LLP.

[9] The plaintiff nurses claimed that Walczak's "statements implied the existence of undisclosed facts, namely, that the decision to terminate each of the plaintiff nurses was based on her actions in connection with undisclosed incidents involving patients in the unit, which were known to Walczak and had been 'thoroughly investigated.'"

final written reports had defamed them by falsely suggesting that they had "adhered to a 'code of silence,'" had failed to report "a variety of problems, . . . including misconduct," of which they were aware, and had been derelict in their duties in a number of other respects.

Both sets of defendants responded by filing special motions to dismiss the defamation counts under the anti-SLAPP statute. See G. L. c. 231, § 59H.[10]  A Superior Court judge allowed the Proskauer defendants' special motion to dismiss, but denied the hospital defendants' motion.  The hospital defendants appealed.[11] The Appeals Court reversed in part, allowing the defendants' special motion to dismiss with respect to Walczak's comments to the Boston Globe, affirming the denial with respect to the e-mail message, and denying the hospital's motion for attorney's fees and costs.  Blanchard, 89 Mass. App. Ct. at 98, 111 & n.14. We granted the parties' cross applications for further appellate review.

3.  Discussion  a.  The anti-SLAPP statute.  The Legislature enacted the anti-SLAPP statute to counteract "SLAPP"

_____

[10] Both sets of defendants also filed motions to dismiss the other claims under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974).  At a hearing on the motions to dismiss, the defendants waived their motions under rule 12 (b) (6).

[11] Defendants Harshbarger and Proskauer Rose LLP filed a stipulation of dismissal prior to the proceedings in the Appeals Court, and they have no role in this appeal.

suits, defined broadly as "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." Duracraft, 427 Mass. at 161, quoting 1994 House Doc. No. 1520. See G. L. c. 231, § 59H. See also Cardno ChemRisk, LLC, v. Foytlin, 476 Mass. 479, 488 n.14 (2017) (explaining catalyst for legislation). The main "objective of SLAPP suits is not to win them, but to use litigation to intimidate opponents' exercise of rights of petitioning and speech." Duracraft, supra. To forestall such suits, the anti-SLAPP statute provides a "procedural remedy for early dismissal of the disfavored" lawsuits. Id. This remedy is the special motion to dismiss, which can be brought prior to engaging in discovery, and is intended to dispose of "civil claims, counterclaims, or cross claims" that are based solely on a party's exercise of its right to petition. See G. L. c. 231, § 59H. The statute also mandates the award of attorney's fees to successful special movants. Id.

To prevail on such a motion, a special movant, such as the hospital defendants here, "must make a threshold showing through pleadings and affidavits that the claims against it 'are "based on" the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities.'" Fustolo v. Hollander, 455 Mass. 861, 865 (2010), quoting

Duracraft, supra at 167-168.  See Fabre, 436 Mass. at 524

(special movant must demonstrate that "the only conduct

complained of is . . . petitioning activity").[12]  The anti-SLAPP

statute defines a party's exercise of its right to petition

broadly to include:

> "[1] any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; [2] any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; [3] any statement reasonably likely to encourage consideration or review of an issue by a legislative executive, or judicial body or any other governmental proceeding; [4] any statement reasonably likely to enlist public participation in an effort to effect such consideration; or [5] any other statement falling within constitutional protection of the right to petition government."

G. L. c. 231, § 59H.

If the hospital defendants are able to make a threshold

showing that the plaintiff nurses' claim is based solely on the

hospital defendants' petitioning activities, the burden shifts

to the plaintiff nurses to establish "by a preponderance of the

evidence that the [hospital defendants] lacked any reasonable

---

[12] The statute also requires a special movant to demonstrate that it was exercising "its own right of petition" in both the statutory and the constitutional sense.  See Cardno ChemRisk, LLC v. Foytlin, 476 Mass. 479, 486-489 (2017); G. L. c. 231, § 59H ("In any case in which a party asserts that the civil claims, counterclaims, or cross claims against said party are based on said party's exercise of its right of petition under the [C]onstitution of the United States or of the [C]ommonwealth, said party may bring a special motion to dismiss").

factual support or any arguable basis in law for its petitioning activity," Baker v. Parsons, 434 Mass. 543, 553-554 (2001), and that the hospital defendants' sham petitioning activity caused the plaintiff nurses "actual injury." G. L. c. 231, § 59H. See Fustolo, 455 Mass. at 865.

b. Petitioning activity. As part of its threshold burden, the hospital defendants must show that the conduct complained of constitutes the exercise of its right to petition. See Baker, 434 Mass. at 550. The hospital defendants contend that the motion judge erred in determining that Walczak's communications to the Boston Globe and to the hospital employees did not constitute petitioning activity under the anti-SLAPP statute. The hospital defendants argue that Walczak's statements to the Boston Globe, and his e-mail message to all hospital employees, were the exercise of the hospital defendants' right to petition because such statements were made "in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding."[13] See G. L. c. 231, § 59H. Given that DMH was considering whether to revoke the hospital's license to operate the unit when the statements were made, the hospital defendants contend that both communications were part of the hospital's efforts to maintain

_____

[13] The defendants do not contend that Walczak's communications fall under any of the other definitions of petitioning activity in the anti-SLAPP statute.

its license to operate the unit by demonstrating that it was taking remedial steps.

The initial question before us is thus whether Walczak's communications to the Boston Globe and to the hospital employees were each made "in connection with" DMH's investigation of the incidents and its decision regarding the hospital's license to operate the unit, such that they constitute petitioning activity under the anti-SLAPP statute.  In determining whether statements constitute petitioning, "we consider them in the over-all context in which they are made."  North Am. Expositions Co. Ltd. Partnership v. Corcoran, 452 Mass. 852, 862 (2009).  To fall under the "in connection with" definition of petitioning under the anti-SLAPP statute, a communication must be "made to influence, inform, or at the very least, reach governmental bodies -- either directly or indirectly."  Id., quoting Global NAPs, Inc. v. Verizon New England, Inc., 63 Mass. App. Ct. 600, 605 (2005).  The key requirement of this definition of petitioning is the establishment of a plausible nexus between the statement and the governmental proceeding.

The archetypical demonstration of this nexus involves a party's statement regarding an ongoing governmental proceeding made directly to a governmental body.  See, e.g., Office One, Inc. v. Lopez, 437 Mass. 113, 123 (2002) (communications with Federal Deposit Insurance Corporation seeking favorable outcome

constituted petitioning activity).[14]  Failing something this clear cut, courts look to objective indicia of a party's intent to influence a governmental proceeding.  See North Am. Expositions Co. Ltd. Partnership, 452 Mass. at 862-863 (statement was petitioning activity where context in which it was made suggested it was intended to influence governmental body).  This intent to influence is manifested in statements that are "closely and rationally related to the [governmental proceeding]" and "in furtherance of the objective served by governmental consideration of the issue under review."  Plante v. Wylie, 63 Mass. App. Ct. 151, 159 (2005).  Contrast Global NAPs, Inc., 63 Mass. App. Ct. at 607 (statements to newspaper containing oblique reference to defendant's petitioning activity not protected under anti-SLAPP statute); Burley v. Comets Community Youth Ctr., Inc., 75 Mass. App. Ct. 818, 823 (2009) (defendant failed to demonstrate "statements were made in conjunction with its protected petitioning activity . . . as opposed to being incidental observations that were not tied to the petitioning activity in a direct way" [quotations and citation omitted]).

---

[14] Such activity also would fall under the first definition of petitioning activity in the anti-SLAPP statute.  See G. L. c. 231, § 59H (defining petitioning activity as "any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding . . . .").

We turn to the two types of communications at issue here.

i. Statements to the Boston Globe. Walczak's statements to the Boston Globe commented on DMH's inquiry into the incidents of abuse at the unit, and the hospital's attempts to address the situation. Walczak's comments had a plausible nexus to DMH's investigation based on their content and the high likelihood that they would influence or at least reach DMH.

Based on their content, it can be reasonably inferred that Walczak's statements to the Boston Globe were intended to demonstrate to DMH the hospital's public commitment to address the underlying problems at the unit. It is undisputed that DMH was considering whether to revoke the hospital's license to operate the unit at the time that Walczak made his comments to the Boston Globe. DMH's decision whether to do so turned on the hospital's implementation of remedial steps to prevent future incidents.[15] The content of Walczak's statements directly addresses DMH's concern.

In the first article, published on May 28, 2011, Walczak's statements implied that he had decided to terminate the nurses' employment as a remedial action, based on Harshbarger's

---

[15] The then director of licensing at the Department of Mental Health (DMH) testified at an arbitration hearing regarding the nurses' claim for reinstatement to the unit that the decision whether to revoke the hospital's license to operate the unit centered on the hospital's "plan . . . to make [the situation] right."

recommendation. He is quoted as stating that the Harshbarger report described "serious concerns about patient safety and quality of care on the unit" and that the report recommended he "start over on the unit." Walczak's statements in the second article, dated June 22, 2011, noted that the Harshbarger report indicated "it wasn't a safe situation [at the unit]" and that the reports of additional incidents "required a much deeper look at what was going on in the unit."[16] In both of these statements, Walczak emphasized that he was following the advice contained in the Harshbarger report in addressing the unit's problems.

By making clear that the hospital was following Harshbarger's recommendations, the statements communicated to readers, likely including some of the licensing decision makers at DMH, that progress was occurring at the hospital, and that its license to operate the unit should not be revoked. These statements were neither "tangential" nor "unrelated to governmental involvement," Global NAPs, Inc., 63 Mass. App. Ct. at 607, but rather went to the heart of a government agency's decision whether to terminate the hospital's license to operate the unit. The statements directly related to DMH's then-pending investigation and, in particular, to DMH's decision whether to

---

[16] The article noted that, at the time, DMH had confirmed the first three incidents at the unit and was still investigating the fourth asserted incident of abuse.

pull the plug on the hospital's license for the unit.  Walczak's statements can fairly be said to have been "closely and rationally related" to DMH's investigation and "in furtherance of the objective" of the hospital's petitioning -- the preservation of the hospital's license to operate the unit. Plante, 63 Mass. App. Ct. at 159.

Walczak's statements, moreover, were issued in a manner that was likely to influence or, at the very least, reach DMH. He made his statements to the Boston Globe, a newspaper "widely circulated in Boston and throughout the Commonwealth."  Brauer v. Globe Newspaper Co., 351 Mass. 53, 54 (1966).  Decision makers at DMH, and members of the public wishing to weigh in on the licensing decision, could reasonably have been expected to read Walczak's statements.  The timing of Walczak's statements to the Boston Globe indicates, as well, a plausible nexus between the communications and DMH's licensure decision, the statements having been made while DMH's investigation was still ongoing.

The plaintiff nurses contend that Walczak made the statements primarily to defend the unit's reputation to the public.  This goal, however, hardly can be seen as unrelated to the hospital's objective of convincing DMH to leave intact the hospital's license to operate the unit.  The greater the public's confidence in and support for the hospital, the more

complex any decision to revoke the hospital's license to operate the unit would become. Ulterior motives, in any event, do not bear on the petitioning nature of the statements to the Boston Globe. See North Am. Expositions Co. Ltd. Partnership, 452 Mass. at 863 ("the fact that . . . speech involves a commercial motive does not mean it is not petitioning"). Accordingly, we conclude that Walczak's statements to the Boston Globe were protected petitioning activity under the anti-SLAPP statute.

ii. Internal e-mail message. In contrast, Walczak's e-mail message to all hospital employees concerning the termination of the plaintiff nurses' employment was not petitioning activity. Neither the content of the e-mail message, nor any evidence offered by the hospital defendants, suggests any audience for the message other than hospital employees. The explanation of troubling events at their workplace that was presented to hospital employees in an e-mail message by the hospital's president has no plausible nexus to the hospital's efforts to sway DMH's licensing decision.

In this regard, the defendants have not shown that the e-mail message to employees had reached, or was reasonably likely to reach, DMH. A private statement to a select group of people does not, without more, establish a plausible nexus to a governmental proceeding. It stands to reason that statements cannot be "in furtherance of" petitioning the government if they

are not reasonably geared to reaching it.  Plante, 63 Mass. App.

Ct. at 159.  The defendants have not shown that the hospital or

someone on its behalf had forwarded the e-mail message to DMH or

even had informed DMH that it had been sent to hospital

employees.  Nor have the defendants shown that someone in the

hospital's employ receiving the e-mail message reasonably would

be expected to or did communicate its message to DMH.  Walczak's

conclusory affidavit stating that he intended the e-mail message

to come to DMH's attention[17] does not indicate any mechanism

through which the statement could arrive at the agency.[18]  See

Burley, 75 Mass. App. Ct. at 823-824 (defendants' message to

employees was not petitioning activity despite defendants'

contention that they intended message to be conveyed to police).

---

[17] Walczak attested that he had sent the electronic mail (e-mail) message "not only to communicate to the hospital employees what was happening, but to give assurances to the regulatory agencies" in the process of determining whether to revoke the hospital's license to operate the unit "that the deficiencies which ha[d] been reported on the [u]nit would not continue." Yet the defendants fail to establish that DMH likely would have encountered the message, let alone that what employees were told would influence DMH's decision concerning the hospital's license to operate the unit.

[18] The defendants also note that, in his affidavit, Harshbarger stated that he communicated to the general counsel of DMH, "the action [that the hospital's] leadership was taking in response to the [i]ncidents."  Harshbarger's summation of the hospital's efforts, however, does not affect the analysis of whether Walczak's e-mail message was intended to or did influence DMH.

Walczak's intent alone does not suffice in the circumstances to establish the requisite nexus.

Moreover, nothing in the content of the e-mail message itself, stating in essence that the terminated nurses deviated from the hospital's "rich tradition of providing excellent care to [its] patients," suggests that it was intended to influence or reach DMH. The e-mail message begins by lauding the hospital's "performance on national quality and safety standards," and notes that the "employees and caregivers at" the hospital are the reason for its exemplary performance. Walczak then states that he had "thoroughly investigated" allegations concerning the incidents at the unit, "determined that [the plaintiff nurses] have not been acting in the best interest of their patients, the hospital, or the community we serve," and concluded by addressing the plaintiff nurses' termination. There is nothing in this text to suggest that it was intended to influence, inform, or reach anyone other than the hospital employees to whom an explanation of concerning events at their workplace was given.

In light of this, we conclude that while Walczak's statements to the Boston Globe were protected petitioning activity, his e-mail message to hospital employees was not an exercise of the hospital defendants' right of petition.

c. The meaning of "based on." Given the foregoing, the hospital defendants take the view that they have met their threshold burden by showing that the portion of the defamation claim based on the Boston Globe articles is solely based on such petitioning activity. They maintain that, if the nurses cannot show that this petitioning activity was, in essence, a sham, so much of their claim as asserts that the Boston Globe statements defamed them should be dismissed, with the plaintiff nurses made to pay a proportionate amount of the defendants' legal fees and costs. The plaintiff nurses, in contrast, maintain that, because some of their unitary defamation claim rests on nonpetitioning activity, the hospital defendants fail to show that the defamation claim is solely based on the defendants' petitioning activity.

Although we have said that a complaint should be evaluated count by count for anti-SLAPP purposes, see Wenger v. Aceto, 451 Mass. 1, 9 (2008) (granting special motion to dismiss with respect to two specific counts in nonmoving party's complaint), we have not had occasion to consider whether, at the threshold burden stage, the special movant can meet its burden by showing that a portion of the nonmoving party's claim is based on petitioning activity. Because the outcome of the threshold burden inquiry so often proves dispositive of the special motion, the permutations of that preliminary stage have largely

occupied the field of appellate consideration.[19]  This case

involves yet another variation on that theme.  However, it also

involves more than that.

---

[19] Twelve out of the seventeen cases decided by this court and the majority of the cases decided by the Appeals Court that address the anti-SLAPP statute in depth have centered on the special movant's threshold burden.  This appellate jurisprudence has split the special movant's threshold burden into three parts.  First, the special movant must establish that its complained of conduct is petitioning activity.  See, e.g., Hanover v. New England Regional Council of Carpenters, 467 Mass. 587, 590-595 (2014); Marabello v. Boston Bark Corp., 463 Mass. 394, 397-400 (2012); North Am. Expositions Co. Ltd. Partnership v. Corcoran, 452 Mass. 852, 861-862 (2009); Cadle Co. v. Schlichtmann, 448 Mass. 242, 250 (2007); Global NAPs, Inc. v. Verizon New England, Inc., 63 Mass. App. Ct. 600, 606-607 (2005).  Second, the special movant must establish that the activity is its own petitioning activity.  See, e.g., Cardno ChemRisk, LLC, 476 Mass. 485, 486 (2017); Fustolo v. Hollander, 455 Mass. 861, 869 (2010); Kobrin v. Gastfriend, 443 Mass. 327, 330 (2005).  Third, the special movant must demonstrate that the nonmoving party's claims are solely based on its petitioning activity.  See, e.g., Matter of the Discipline of Attorney, 442 Mass. 660, 673-674 (2004); Office One, Inc. v. Lopez, 437 Mass. 113, 121-123 (2002); Fabre v. Walton, 436 Mass. 517, 522-523 (2002); McLarnon v. Jokisch, 431 Mass. 343, 348 (2000); Duracraft Corp. v. Holmes Products Corp., 427 Mass. 156, 167-168 (1998).

Similarly, Appeals Court cases construing the anti-SLAPP statute center chiefly on the nonmoving party's threshold burden.  See Chiulli v. Liberty Mut. Ins., Inc., 87 Mass. App. Ct. 229, 234 (2015); Keystone Freight Corp. v. Bartlett Consol., Inc., 77 Mass. App. Ct. 304, 316 (2010); Brice Estates, Inc. v. Smith, 76 Mass. App. Ct. 394, 396-397 (2010); Burley v. Comets Community Youth Ctr., Inc., 75 Mass. App. Ct. 818, 823-824 (2009); Dickey v. Warren, 75 Mass. App. Ct. 585, 588-589 (2009), cert. denied, 560 U.S. 926 (2010); Ehrlich v. Stern, 74 Mass. App. Ct. 531, 537-538 (2009); Guiffrida v. High Country Investor, Inc., 73 Mass. App. Ct. 225, 243 (2008); Moriarty v. Mayor of Holyoke, 71 Mass. App. Ct. 442, 447-448 (2008); Fisher v. Lint, 69 Mass. App. Ct. 360, 363-365 (2007); SMS Financial V, LLC v. Conti, 68 Mass. App. Ct. 738, 745-747 (2007); Kalter v.

Each of the positions advanced by the parties as to what solely based on should entail at the threshold burden stage has some merit, but our resolution of that issue cannot reach or settle the deeper problem that is laid bare in this appeal. That problem is whether the plaintiff nurses' defamation claim is, in fact, a "SLAPP" suit at all. Otherwise put, even if it were shown that the Boston Globe based portion of the nurses' defamation claim arises from and is, in that limited sense, solely based on their hospital employer's quite legitimate petitioning activity, it nevertheless remains unclear whether this qualifies as a disfavored "SLAPP" suit meriting early dismissal. Under current case law, the inquiry ends without

Wood, 67 Mass. App. Ct. 584, 586-591 (2006); Global NAPS, Inc., supra at 603-607; Wynne v. Creigle, 63 Mass. App. Ct. 246, 251-255 (2005); Plante v. Wylie, 63 Mass. App. Ct. 151, 157-161 (2005); Adams v. Whitman, 62 Mass. App. Ct. 850, 852-858 (2005); MacDonald v. Paton, 57 Mass. App. Ct. 290, 294-295 (2003); Ayasli v. Armstrong, 56 Mass. App. Ct. 740, 748-749 (2002).

By contrast, only a handful of cases from this court address the nonmoving party's second-stage burden under the anti-SLAPP statute in a substantial way. See Van Liew v. Stansfield, 474 Mass. 31, 36-41 (2016); Benoit v. Frederickson, 454 Mass. 148, 153-154 (2009); Wenger v. Aceto, 451 Mass. 1, 6-9 (2008); Fabre, 436 Mass. at 524-525; Baker v. Parsons, 434 Mass. 543, 553-554 (2001). Similarly, only a smattering of Appeals Court opinions address substantively the nonmoving party's burden. See The Gillette Co. v. Provost, 91 Mass. App. Ct. 133, 137-140 (2017); Demoulas Super Mkts. v. Ryan, 70 Mass. App. Ct. 259, 263-268 (2007); DiPiero v. Burke, 70 Mass. App. Ct. 154, 158-161 (2007); Garabedian v. Westland, 59 Mass. App. Ct. 427, 434 (2003); Donovan v. Gardner, 50 Mass. App. Ct. 595, 599-601 (2000); Vittands v. Sudduth, 49 Mass. App. Ct. 401, 414-415 (2000).

permitting confirmation that the fundamental statutory concern is satisfied, much like the proverbial unacknowledged elephant in the room. To ensure that only "SLAPP" suits -- those without merit primarily brought to chill legitimate petitioning activities -- are subject to early dismissal and its attendant financial penalties, we conclude that the statutory term "based on" must be accorded broader meaning than it has at present.

We turn first, then, to what the threshold burden demands of the special movant seeking early dismissal under the anti-SLAPP statute. In essence, the Duracraft framework imposes the threshold burden as an initial screening device, requiring the special movant to show in the first instance that the claims against it in fact arose only from its own petitioning activities. It stands to reason that, in doing so, the special movant must take the adverse complaint as it finds it, and cannot fairly be expected to overcome the manner in which a nonmoving party has chosen to structure its complaint. Thus, however reasonable it may have been for the nurses to frame their defamation claim against the hospital defendants as one count including two types of communications, we agree with the Appeals Court that, when ascertaining whether petitioning activity is the sole basis of a claim, the structure of the nonmoving party's complaint ordinarily cannot be dispositive of the matter. See Blanchard, 89 Mass. App. Ct. at 111 n.13. Were

it otherwise, nonmoving parties could undercut the anti-SLAPP statute and its salutary purpose by combining into a single count claims that are based on both petitioning and nonpetitioning activities. Where, as here, the claim structured as a single count readily could have been pleaded as separate counts, a special movant can meet its threshold burden with respect to the portion of that count based on petitioning activity.

That being said, the plaintiff nurses' contrary position as to the scope of the threshold burden finds support in Erhlich v. Stern, 74 Mass. App. Ct. 531, 536 (2009), which notes the considerable potency of the sweeping early dismissal remedy provided by the anti-SLAPP statute. In an effort to assure that this remedy is confined only to suits meriting such harsh treatment, the Appeals Court construed the threshold burden strictly, stating that "the anti-SLAPP inquiry produces an all or nothing result as to each count the complaint contains . . . and the statute does not create a process for parsing counts to segregate components that can proceed from those that cannot." Id. While, as explained, we depart from the Ehrlich view of the threshold burden, we recognize the well-founded concerns that underlie it and that prompt us now to revisit the Duracraft framework.

Under current law, there are only two ways for a nonmoving party, such as the nurses here, to resist the early dismissal of their claim as a "SLAPP" suit.  One way is to argue that the special movant has not met its threshold burden.  Failing that, the other way is to argue that the special movant's petitioning activity was not legitimate but instead a sham, i.e., lacking any reasonable basis in fact or law.  Because it is often difficult to make the latter showing,[20] the dispositive issue tends to be whether the special movant's threshold burden has been met.  But, as this case illustrates, even where that burden has been met and the petitioning activity in question may be entirely legitimate, such inquiry is not entirely adequate to the task of determining whether the special motion should be allowed.

Particularly in instances where, as here, the classic indicia of a "SLAPP" suit, see Duracraft, 427 Mass. at 161-162,

---

[20] Under current case law, in order to meet its second-stage burden under the anti-SLAPP statute, a nonmoving party must, in essence, demonstrate through pleadings and affidavits that there is no credible factual or legal basis for the special movant's petitioning activities.  See Benoit, 454 Mass. at 154 n.7; Wenger, 451 Mass. at 7-8.  Given the high bar for nonmoving parties that this generally represents, it is little wonder that the plaintiff nurses focused almost entirely on the hospital defendants' purported failure to meet their threshold burden.  See Blanchard, 89 Mass. App. Ct. at 109 (concluding that plaintiff nurses did not attempt to make showing that hospital defendants' statements to Boston Globe were "devoid of factual or legal support" and thus failed to meet their second-stage burden).

appear to be absent,[21] the present framework does not provide adequate means to distinguish between meritless claims targeting legitimate petitioning activity and meritorious claims with no such goal.[22]  It is only the former, the actual "SLAPP" suit, that the Legislature intended to stop early in its tracks.  The Legislature did not intend the expedited remedy it provided, the special motion to dismiss, to be used instead as a cudgel to forestall and chill the legitimate claims -- also petitioning activity -- of those who may truly be aggrieved by the sometimes collateral damage wrought by another's valid petitioning activity.  We are mindful that the threshold burden was itself crafted to address this underlying concern and its genesis accordingly remains instructive.

---

[21] Contrast Cardno ChemRisk, LLC, 476 Mass. at 480-483 & n.10, where the plaintiff nonmoving party, an established scientific consulting firm, brought defamation claims in two States against individual environmental activists of modest means, while not having brought such claims against parties of apparent financial capacity and public stature who had published similar allegedly defamatory statements.  Following its receipt of discovery from the individual defendants but before responding to the defendants' discovery requests, and during the pendency of the defendants' ultimately successful appeal from the denial of their special motion to dismiss, the plaintiff moved voluntarily to dismiss its lawsuit; the motion was denied. Id. at 483 n.8.

[22] The plaintiff nurses, for their part, maintain that they supported the goal of the hospital defendants' petitioning, which was to preserve the hospital's license to operate the unit.

The threshold burden, not appearing in the anti-SLAPP statute itself, was prudently imposed upon special movants as a means of bridging the discrepancy between the statute's evident purpose and its language and, thereby, of addressing constitutional concerns otherwise raised. Duracraft, 427 Mass. at 167-168. While the Legislature passed the anti-SLAPP statute to counteract "meritless" lawsuits brought to chill a party's petitioning activity, i.e., "SLAPP" suits, id. at 161, the Duracraft court realized that the "statutory language fails to track and implement such an objective." Id. at 166. See id. at 163 ("In the statute as enacted, the Legislature . . . did not address concerns over its breadth and reach, and ignored its potential uses in litigation far different from the typical SLAPP suit").

The statute as written does not focus on ascertaining whether the nonmoving party's claim is in fact a "SLAPP" suit. Instead, it looks only to whether the special movant's own legitimate petitioning activity forms the basis of that claim. This leaves open the possibility that a special movant, whose legitimate petitioning activity forms the basis of a meritorious adverse claim that is not primarily geared toward chilling such petitioning, may nonetheless use the special motion to eradicate

that nonmoving party's adverse claim.[23]  As has long been recognized, this potential infringement of an "adverse party's exercise of its right to petition, even when it is not engaged in sham petitioning . . . has troubled judges and bedeviled the statute's application."  Duracraft, 427 Mass. at 166-167.[24]

---

[23] The Illinois Supreme Court described the problem succinctly when addressing Illinois's anti-SLAPP law, which in many respects mirrors that of the Commonwealth.  The court wrote:

> "The sham exception tests the genuineness of the defendants' acts; it says nothing about the merits of the plaintiff's lawsuit.  It is entirely possible that defendants could spread malicious lies about an individual while in the course of genuinely petitioning the government for a favorable result.  For instance, in the case at bar, plaintiff alleges that defendants defamed him by making statements that plaintiff abused children, did not get along with colleagues, and performed poorly at his job. Assuming these statements constitute actionable defamation, it does not follow that defendants were not genuinely attempting to achieve a favorable governmental result by pressuring the school board into firing the plaintiff.  If a plaintiff's complaint genuinely seeks redress for damages from defamation or other intentional torts and, thus, does not constitute a SLAPP, it is irrelevant whether the defendants' actions were genuinely aimed at procuring favorable government action, result, or outcome" (footnote and quotations omitted).

Sandholm v. Kuecker, 2012 IL 111443, ¶ 53.

[24] Both the United States Constitution and the Massachusetts Declaration of Rights provide a right to petition that includes the right to seek judicial resolution of disputes.  Sahli v. Bull HN Information Sys., Inc., 437 Mass. 696, 700-701 (2002) (noting "constitutional right to seek judicial resolution of disputes under the First Amendment to the United States Constitution and art. 11 of the Massachusetts Declaration of Rights").  See First Amendment ("Congress shall make no law . . . abridging . . . the right of the people . . . to

To ameliorate this constitutional infirmity and to ensure that only "SLAPP" suits are subject to dismissal, the Duracraft court imposed upon special movants the burden of showing that the claims against them are "solely based on" protected petitioning activity. See Duracraft, 427 Mass. at 165, 167 ("Because the Legislature intended to immunize parties from claims 'based on' their petitioning activities, we adopt a construction of 'based on' that would exclude motions brought against meritorious claims with a substantial basis other than or in addition to the petitioning activities implicated"). The goal of this framework was to "distinguish meritless from meritorious claims, as was intended by the Legislature." Id. at 168.

While the Duracraft framework limited the reach of the statute and mitigated the problem, subsequent experience has shown that it did not eliminate it. The statute continues to permit, in certain circumstances, the expedited dismissal of a nonmoving party's meritorious claim that does not seek primarily to chill protected petitioning activity, i.e., non"SLAPP" suits.

_____

petition the Government for a redress of grievances."); art. 11 ("Every subject of the Commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character"); art. 19 of the Massachusetts Declaration of Rights ("The people have a right . . . to request of the legislative body, by the way of . . . petitions . . . redress of the wrongs done them, and of the grievances they suffer"). See also Kobrin, 443 Mass. at 333.

The reason the statute can still "be misused to allow motions for expedited dismissal of nonfrivolous claims in contravention of the Legislature's intent," Matter of the Discipline of an Attorney, 442 Mass. 660, 673 (2004), is its exclusive focus on the special movant's petitioning activity in determining whether the nonmoving party's claim is a "SLAPP" suit. Without also considering the nonmoving party's claim, however, a court cannot adequately assess whether it is a meritless "SLAPP" suit aimed primarily at chilling a special movant's right to petition or, instead, a valid exercise of the nonmoving party's own right to petition.

d. Augmenting the Duracraft framework. To ensure that the anti-SLAPP statute will "distinguish meritless from meritorious claims, as was intended by the Legislature," Duracraft, 427 Mass. at 168, we once again narrow the problematic sweep of the statute by broadening the meaning of the term "based on." A nonmoving party's claim is not subject to dismissal as one "based on" a special movant's petitioning activity if, when the burden shifts to it, the nonmoving party can establish that its suit was not "brought primarily to chill" the special movant's legitimate exercise of its right to petition. See Duracraft, 427 Mass. at 161, quoting 1994 House Doc. No. 1520. In other words, a claim that is not a "SLAPP" suit will not be dismissed.

As a practical matter, the expedited special motion to dismiss will proceed as follows, still in essentially two stages, taking place early in the litigation and with limited discovery available only by leave of court.  See G. L. c. 231, § 59H.  At the first stage, a special movant must demonstrate that the nonmoving party's claims are solely based on its own petitioning activities.  This is the familiar Duracraft threshold inquiry, which will remain unchanged.  At the second stage, if the special movant meets this initial burden, the burden will shift, as it does now, to the nonmoving party.  The nonmoving party may still prevail, as at present, by demonstrating that the special movant's petitioning activities upon which the challenged claim is based lack a reasonable basis in fact or law, i.e., constitute sham petitioning, and that the petitioning activities at issue caused it injury.  G. L. c. 231, § 59H.

If it cannot make this showing, however, the nonmoving party may henceforth meet its second-stage burden and defeat the special motion to dismiss by demonstrating in the alternative that each challenged claim does not give rise to a "SLAPP" suit. It may do so by demonstrating that each such claim was not primarily brought to chill the special movant's legitimate petitioning activities.  To make this showing, the nonmoving party must establish, such that the motion judge may conclude

with fair assurance, that its primary motivating goal in bringing its claim, viewed in its entirety, was "not to interfere with and burden defendants' . . . petition rights, but to seek damages for the personal harm to [it] from [the] defendants' alleged . . . [legally transgressive] acts." Sandholm v. Kuecker, 2012 IL 111443, ¶ 57.  The nonmoving party must make this showing with respect to each such claim viewed as a whole.[25]

In applying this standard, the motion judge, in the exercise of sound discretion, is to assess the totality of the circumstances pertinent to the nonmoving party's asserted primary purpose in bringing its claim.  The course and manner of

_____

[25] At the first stage of the anti-SLAPP inquiry, courts assess whether the nonmoving party's claim is solely "based on" the special movant's petitioning activity in the sense that the nonmoving party's claim itself arises only from and complains only of that petitioning activity.  See Fabre, 436 Mass. at 524. If the special movant meets this threshold burden, and the nonmoving party then fails to show that such petitioning activity was sham petitioning, the nonmoving party may now attempt to establish, under the augmented Duracraft framework, that its claim is not "based on" the special movant's legitimate petitioning activity because its primary motivating goal in bringing the claim was not to chill such petitioning.  Because at this stage the motion judge is to assess in a holistic fashion whether the claim at issue is a "SLAPP" suit, the nonmoving party's showing in this regard is as to the entirety of its claim.  Otherwise put, the plaintiff nurses on remand may attempt to demonstrate that their primary motivating goal in bringing a purportedly meritorious defamation claim against the hospital defendants -- alleging as defamatory both the e-mail message to employees and the Boston Globe articles -- was not to chill the hospital defendants' legitimate exercise of their right to petition government in aid of retaining the hospital's licensure of the unit.

proceedings, the pleadings filed, and affidavits "stating the facts upon which the liability or defense is based," G. L. c. 231, § 59H, may all be considered in evaluating whether the claim is a "SLAPP" suit.  See Duracraft, 427 Mass. at 161-162 (listing classic indicia of "SLAPP" suits).[26]  A necessary but not sufficient factor in this analysis will be whether the nonmoving party's claim at issue is "colorable or . . . worthy of being presented to and considered by the court," see L.B. v. Chief Justice of Probate & Family Court Dept., 474 Mass. 231, 241 (2016), i.e., whether it "offers some reasonable possibility" of a decision in the party's favor.  See Commonwealth v. Levin, 7 Mass. App. Ct. 501, 504 (1979).

On remand, then, the plaintiff nurses may seek to demonstrate that the hospital defendants' petitioning activity, i.e., the statements in the Boston Globe article, lacks any reasonable basis in fact or law and caused the nurses injury.

---

[26] This type of inquiry is not unknown in the anti-SLAPP context.  In Matter of the Discipline of an Attorney, 442 Mass. 660, 674 (2004), an attorney facing disciplinary charges for allegedly attempting to influence a witness improperly responded by filing a special motion to dismiss.  Because we determined that bar counsel did not have an improper purpose in bringing charges against the attorney, we denied the attorney's special motion.  Id.  We based our conclusion on two factors: (1) bar counsel had "sought to sanction the respondent for 'conduct that is prejudicial to the administration of justice,' an undoubtedly meritorious charge if a witness had been influenced by improper means;" and (2) "the less than careful means of communication employed by the respondent left his conduct at least open to the interpretation urged by bar counsel."  Id.

Failing this, under the augmented <u>Duracraft</u> framework, they may seek to establish that their defamation claim, viewed as a whole, is nonetheless not a "SLAPP" suit. If the plaintiff nurses cannot meet their second-stage burden under the augmented framework, the hospital defendants' special motion to dismiss shall be allowed as to so much of the defamation claim as is based on the <u>Boston Globe</u> articles, and an appropriate award of attorney's fees and costs shall be made.

4. <u>Conclusion</u>. The denial of the hospital defendants' special motion to dismiss the plaintiffs' defamation claim as to Walczak's statements to the Boston Globe is vacated. In all other respects, the order is affirmed. The matter is remanded to the Superior Court for further proceedings consistent with this opinion.

<u>So ordered</u>.